## FISHER et al. v. BARBER. (No. 1774.)

Court of Civil Appeals of Texas. Beaumont.
Oct. 17, 1929.

Chas. O. Guynes, of Houston, for appellants.

E. B. Pickett, Jr., of Liberty, for appellee.

WALKER, J. This suit was instituted by appellee against appellants in trespass to try title to recover the title and possession of the Benjamin Winfree survey, Chambers county school survey No. 5, and Chambers county school survey No. 2, situated in Chambers county, and to enjoin appellants from hunting and fishing thereon. Pending trial on the merits, temporary injunction issued restraining appellants from hunting and fishing upon the lands sued for. By their trial answer appellants disclaimed all title, right, claim, or interest in and to all of the lands sued for except that portion covered by water. They pleaded that a large portion of this land was covered by navigable waters, and contended that to the extent that the lands sued for were covered by navigable waters they had the right to hunt and fish thereon. Upon trial to the court without a jury, judgment was entered in appellee's favor for the title and possession of all the lands sued for, and the injunction was perpetuated, perpetually enjoining appellants from hunting and fishing thereon.

Title to the Winfree survey was issued in 1835, patent issued to survey No. 5 in 1878 and to survey No. 2 in 1879. Appellee held these lands under regular chains of transfer from and under the original grantees.

The lands sued for lie near the waters of Trinity Bay, an arm of the Gulf of Mexico. Near the beach, and parallel therewith, lies a narrow ridge of land slightly elevated above the beach and the land lying beyond it. This ridge, known as "High Tree Ridge," extends along the beach for several miles until near a point where it enters survey No. 5, where it turns in a northeasterly direction, crosses that survey, the southwest corner of the Winfree survey, and enters survey No. 2, but terminates near its east boundary line. Immediately beyond High Tree ridge from the beach lies a long narrow depression known as "Wet Marsh," considerably lower than the ridge and a few inches below sea level. This marsh, from and before the granting of those titles, was subject to overflow from the waters of Trinity river and from the bay at very high tide, but at the time of the trial of this case it was subject to the ebb and flow of the tides from Trinity Bay. High Tree bayou flows out of the northeast end of Wet marsh between the north end of High Tree ridge and Mustang Island, a small tract of land elevated above the surrounding lands, south into Cross bayou which flows into Trinity Bay.

At the time of the trial the tide waters from the bay flowed up these bayous into Wet marsh. At the time of the trial hunting boats and small passenger boats could be and were navigated up these bayous into Wet marsh and over the waters of Wet marsh. Appellants were engaged in the business of taking out hunting parties by this means over the waters of the marsh and the bayous. But at the time the titles were issued, and for many years thereafter, there was no direct connection between the two bayous and Wet marsh through which the ordinary tides could ebb and flow, but within the last few years a channel had been dug between High Tree ridge and Mustang Island. The trial court filed conclusions of fact to the effect that, when these titles were issued, and for many years thereafter, Wet marsh was not subject to the ebb and flow of the tides from Trinity Bay, and was not a navigable body of water, but within recent years, because of the channel connecting High Tree bayou with Wet

marsh, it had become a navigable body of water.

Without quoting from the evidence, we overrule appellants' assignments against the conclusion that Wet marsh was not navigable when the titles were issued. This conclusion has abundant support.

While no conclusion was made by the court, and none asked, as to the navigability of the bayous at the time the titles were issued, the issue was raised that they were not navigable, and in support of the trial court's judgment we so conclude.

■■ As no part of the lands in controversy was covered by navigable waters at the time the titles were issued, the lands in their entirety were subject to grant, and the original grantees acquired good and valid titles thereto to the full extent of the defined boundaries, which titles were regularly transferred to appellee and owned and held by him at the time of the trial of this case. That a portion of these lands, to wit, the land lying under the waters of Wet marsh and the waters of the two bayous, became subject to the ebb and flow of the tides of Trinity Bay, thereby converting them into and making them a part of the navigable waters of Trinity Bay, did not deprive appellee of the title to that portion of his lands so submerged. He remained the legal owner and holder of all the land claimed by him to the utmost extent of his boundaries.

■ But, if appellee be conceded the ownership of the soil under the waters of the two bayous and under the waters of Wet marsh, yet appellants insist that these waters are public waters over which they "had a right to pass and in which they have a right to stand and hunt without interference on the part of anyone so long as their passing and hunting otherwise conforms to the laws of the state." By this proposition we do not understand that appellants are contending for a mere passageway over the waters for the purpose of transporting passengers, as such, from point to point, but for an easement in and over the waters as long as they are navigable for hunting over the waters and fishing therein and standing therein for hunting and fishing purposes; that is to say, we understand that all rights claimed and asserted by appellants are claimed as mere incidents to their hunting and fishing privileges and carrying passengers up and down these waters for the purpose of hunting and fishing therein.

Thus construing their proposition, the trial court's judgment whereby appellants were "forever restrained from entering upon said lands and premises and from hunting thereon and also from shooting at any wild game therein and further from trespassing in any way upon said land and premises" has support in the facts, and is fully sustained by the authorities. The title to the land was unaffected by the fact that it was subsequently covered by navigable waters. Appellee, as the owner of the fee in the soil under the waters, was entitled to the exclusive enjoyment of all the rights inherent in such ownership, which includes the exclusive right of hunting and fishing thereon and in the waters covering his lands. In these respects and as to these rights, being the only rights in litigation before us, that appellee's lands are now in part covered by navigable waters is immaterial.

On the proposition thus discussed State v. West Tennessee Land Co., 127 Tenn. 575, 158 S. W. 746, 748, Ann. Cas. 1914B, 1043, by the Supreme Court of Tennessee, is directly in point. We quote as follows from that case:

"From 300 to 400 people take fish from the waters of the lake daily and employ in this capacity something like 1,000 small boats, canoes, and batteaux. They take annually from 1,000,000 to 1,500,000 pounds of fish. Wild fowl are killed upon its waters every year in large quantities. Its waters are clear and pure, and as a breeding ground for fish it is probably not excelled anywhere in the world. Before the building of the levee above mentioned the fish would have free access from the lake to the Mississippi river and from the river to the lake during high water. The public have used the lake and its fowling and fishing privileges at will for more than 40 years."

And, after citing authorities and commenting on other facts in the case, the court said:

"We think, therefore, that it can be reasonably held that Reelfoot Lake has sufficient capacity—that is, sufficient depth and width and volume—of water so as to make it a navigable stream in the strict technical legal sense." And:

"It should be stated that the defendants claim under grants issued by the state of North Carolina to one Doherty before the lake was formed. At this time the lands were subject to grant, and the grants issued by North Carolina were valid at the date of their issue, and the titles conveyed by them vested in Doherty, the grantee. * * * Does the fact that the Doherty grants were submerged by the lake after they were granted, and are now the bed of a navigable stream, deprive the owners of the submerged land of their title to the lands and their right to claim the fisheries in the waters lying over them? Upon this particular question, we have not been cited to any authority directly in point, and we have found none. It would seem, on principle, that the title to the land would be unaffected by the formation of the lake, and its owners would be entitled to its use and its enjoyment as long as they can reasonably identify it and fix its boundaries. It is proven in this case that the Doherty grants can still be identified, and their boundaries are reasonably well established. The waters of the lake are clear, and many of the monuments of boundary can still be identified. Grants Nos. 51, 90, and 31 are not totally submerged, and portions of them are still upland and form parts of the shore of the lake. Grant No. 161

is entirely submerged; but its boundaries are located, and it is platted on the map. As these lands were grantable by North Carolina, and were subject to private ownership before the formation of the lake, we are of opinion that the mere fact that they have since become submerged by a body of navigable water does not deprive the owners of their title to the land as long as they can be reasonably identified. Upon all of the authorities, this title and ownership will carry with it the exclusive right of fishery in the waters over these grants."

The court concluding:

"For the reasons stated, it is our opinion that the complainant is entitled to a decree establishing its title in trust for all the people to all that portion of the lake, its fisheries and fowling privileges, lying outside of, and not over and above, the grants issued by the state of North Carolina to Doherty. As to those grants, the bill will be dismissed."

Sterling v. Jackson, 69 Mich. 488, 37 N. W. 845, 853, 13 Am. St. Rep. 405, is on all fours in its facts. The land in dispute in that case, as in the case before us, lay behind an elevated ridge from the waters of the navigable lake. By some means a channel was cut across this ridge, submerging the land under navigable waters. Before the land was thus submerged, the plaintiff held it under a valid patent. The suit was instituted to test the plaintiff's right, to quote the language of the opinion, "to the private and exclusive use of the land covered by his patent for sporting purposes." The trial court's judgment was for the plaintiff. Affirming the judgment, the Supreme Court of Michigan, by a divided court, said:

"As owner of the fee of the soil under the water, I think he is entitled to such exclusive right, and that the judgment should be affirmed. I may add, in conclusion, that, aside from the ownership of the plaintiff of the locus in quo, the only important question in this case is whether a man has the exclusive right of fowling upon his own land. If he has, it can make no difference with that right whether it be upland or covered with water."

On the authorities cited, it is our conclusion that the judgment of the trial court should be affirmed, and it is accordingly so ordered.