**COASTAL INDUSTRIAL WATER AUTHORITY, Appellant,**

v.

**W. D. YORK et al., Appellees.**

**No. 16431.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

Feb. 20, 1975.

Rehearing Denied March 20, 1975.

Jonathan Day, City Atty., Fred R. Spence, Senior Asst. City Atty., Houston, for appellant.

Liddell, Sapp, Zivley & Brown, John C. Nabors, Christopher B. Allen, Houston, for appellees.

COLEMAN, Chief Justice.

This is a trespass to try title suit with which is combined a count for declaratory judgment. The purpose of the suit was to determine the ownership of 3.353 acres of submerged land adjacent to the Houston Ship Channel. The controversy arose in a condemnation suit in which Coastal Industrial Water Authority, the defendant in this suit, sought to condemn all of a tract of land owned by W. D. York and others, the plaintiffs in this suit. The County Court at Law stayed proceedings in the condemnation suit until the question of the ownership of the submerged land could be determined by a suit in district court. After a jury trial the court entered judgment that as of August 4, 1970 the plaintiffs were the legal owners of the 28.083 acres of land out of the A. McCormick Survey in Harris County, Texas, and that said land was taken by defendant on said date. In the course of this opinion the plaintiffs will be referred to as York and the defendant as Coastal.

On November 17, 1961, York purchased from C. Realty Company several tracts of land including the tract in controversy. C. Realty Company conveyed its title to York by general warranty deed in which the property in controversy was described as follows:

"A tract of 28.083 acres of land in the A. McCormick Survey in Harris County, Texas, more particularly described by metes and bounds as follows:

"Beginning at the intersection of the south water's edge of the Houston Ship Channel and the east line of Ward's Addition to Town of San Jacinto, in the Arthur McCormick Survey, Abstract No. 46, according to plat of said Ward's Addition, recorded in Volume 4, Page 39, of the Map Records of Harris County, Texas;

"Thence south 36°30′ west, along fence on the east line of said Ward's Addition, 1203.7 feet to pipe and fence corner;

"Thence south 89° west, along fence, 1081.2 feet to pipe and fence corner;

"Thence north 37° 59′ east, along fence and then along the west edge of above mentioned Ward's Addition, a distance of 1801 feet to point where the west line of said Ward's Addition intersects the south water's edge of the Houston Ship Channel;

"Thence along the south water's edge of the Houston Ship Channel to the place of beginning."

The deed also contained this provision:

"This deed and conveyance is executed by the Grantor and accepted by the Grantees subject to the following easements, rights-of-way, fee conveyances for street purposes, fee conveyances for drainage purposes, . . . and other matters and to the rights of third parties created thereunder (to the extent and only to the extent that same are validly subsisting as of this date):

"(1) Affecting the Ship Channel Tract:

"The rights and titles of the State of Texas, instrumentalities of the State of Texas and the public in general, in and to any portion of such Tract lying northerly of the line of demarcation between private ownership and public ownership of lands abutting upon Buffalo Bayou, as such line may be lawfully fixed."

The warranty contained in the deed reads:

". . . the Grantor does hereby bind itself, its successors and assigns, to

warrant and forever defend all and singular the Subject Lands and premises unto the Grantees, their respective heirs and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through or under the Grantor (but not otherwise) and subject to the matters herein referred to or set out."

The property was not surveyed at the time it was purchased by appellees in 1961. There was available at that time a 1950 survey by Mr. A. C. Stimson, showing 28.-083 acres "calculated to the water's edge". This survey also shows that the water's edge was, in 1912 and in 1928, some distance to the north of the water's edge as compared to its 1950 location. This area, the land covered by water during the period 1928 to 1950, is not in dispute in this case, but it shows that the water's edge had moved inland during that period of time approximately 91 feet.

A survey was made by Mr. Robert M. Atkinson, on December 26, 1961, about two months after appellees bought the land, and established that the water's edge of the Houston Ship Channel had continued to move southward and that in 1961 only 26.-44 acres of land in said tract remained above the water line.

On January 15, 1970 the land was surveyed by Brown & Root, Incorporated, in connection with its acquisition by appellant for public purposes. This survey showed that the water's edge of the Houston Ship Channel had moved farther inland so that there were only 24.73 acres within the tract above the water line. The metes and bounds description of the land to be conveyed contained in the deed to York is that shown by the 1950 survey. York therefore claims ownership of 28.083 acres of land despite the fact that the 1970 survey shows that only 24.73 acres are now beyond the water's edge. Coastal contends that the 3.-353 acres of land which are now submerged beneath the waters of the Houston Ship Channel have been lost to York, if in

fact it was ever conveyed to him, by operation of law, and is now owned by the City of Houston or the State of Texas.

Expert testimony produced at the trial of this case is that the land in this area of Harris County has subsided over a number of years and that since the sea level remains constant the water encroaches on the land. The witness testified that the subsidence was due primarily to mopping out the underground water. As water is produced for various municipal and industrial purposes the amount of pressure in the water, which remains in the aquafiers underground, is reduced, and "this allows the clay to compact, so that a particular layer of clay can be a little bit thinner, the water being squeezed out into the aquafiers and resulting in a loss of elevation on the surface." The expert witness testified that the cause of the subsidence was the withdrawal of underground water.

The parties stipulated "that the Houston Ship Channel and/or the Buffalo Bayou, which names are synonymous, at all times pertinent to this case was a navigable stream." Mr. York testified that prior to the 1961 survey he had driven markers in the water to mark the water's edge for the purpose of seeing whether the land was subsiding and that over a several year period the markers were covered by water. Over a several year period he was able to observe the fact that the "water level was coming up". The evidence establishes that the Houston Ship Channel is a navigable body of water.

The appellant contends that the judgment establishing title in York to 28.083 acres of land is erroneous because, properly construed, the deed into York conveyed only 26.44 acres. This argument is based on the fact that the field notes call for a beginning point at the intersection of the south water's edge of the Houston Ship Channel at the east line of Ward's Addition, and the closing call is from a point at the water's edge along the water's edge to the place of beginning. Coastal contends

that the calls for the water's edge are calls to ascertainable and natural objects and control over calls for distance and for quantity of land contained in the deed.

In the case of Hejl v. Wirth, 161 Tex. 609, 343 S.W.2d 226 (1961), the court said:

> " 'It may be considered a canon in American jurisprudence, that where the calls in a conveyance of land, are for two corners at, in, or on a stream or its bank, and there is an intermediate line extending from one such corner to the other, the stream is the boundary, unless there is something which excludes the operation of this rule by showing that the intention of the parties was otherwise.' "

By Article 7467a, Vernon's Annotated Civil Statutes, the State of Texas granted all incorporated cities and towns having a population of 40,000 inhabitants or more according to the 1920 census all of the beds and channels of all rivers, streams and other channels that are or that may hereafter be within the present or future corporate limits of such cities or towns, insofar as the beds and channels of such rivers, streams or other channels may be owned or claimed as the property of said State. It was stipulated that the Houston Ship Channel was located in the city limits of Houston.

■ Looking to the deed into York as a whole we find that the grantor intended to convey all of his right, title and interest in and to the 28.083 acre tract of land. The parties recognized the fact that there was a question of the grantor's title to the submerged lands along the Houston Ship Channel and the grantor's warranty was made subject to such title as may have reverted to the State of Texas or to public ownership. The purpose of this suit is to fix the line of demarcation between private ownership and public ownership of the land abutting upon Buffalo Bayou. We note at this point that where the State conveys property described as going to the water's edge the grantee would take title only to the water line of the navigable stream, and title to the bed of the stream would remain in the State. City of Austin v. Hall, 93 Tex. 591, 57 S.W. 563 (1900).

■ The deed reflects that the land in controversy constituted a part of the Arthur McCormick Survey, Abstract No. 46, and it is stipulated that the land in question lies within the city limits of the City of Houston. The trial court is authorized to take judicial notice of the surveys or grants of land upon which the City is located. It may take judicial notice of the duties of the Commissioner of the General Land Office, and of the fact that he assigns abstract numbers only to patented land. There is evidence in the form of admissions that York owned 24-plus acres of the land described in the deed. From this evidence, and the facts of which judicial notice may be taken, the trial court properly could have concluded that the State had parted with its title to all of the land which the 1950 survey showed as being above the water's edge. The question remains as to whether title to the submerged land has been reacquired by the State. Williams v. Chew, 19 S.W.2d 68 (Tex.Civ. App.—Galveston 1929); Reserve Petroleum Company v. Harp, 148 Tex. 448, 226 S.W.2d 839 (1950).

The effect of York's petition in this case, although it contains a count in trespass to try title, is to seek a declaratory judgment as to the number of acres of land conveyed to them by the C. Realty Company and as to whether they have lost title to 3-plus acres of said land by reason of its submergence under the waters of the Houston Ship Channel.

There were introduced into evidence certain instruments filed in the eminent domain proceedings in the County Civil Court at Law No. 1 of Harris County, Texas. The plaintiff's statement filed by Coastal, in paragraph 1. thereof, stated:

> "The name or names of the owner or owners of the hereinafter described land

so far as known to Plaintiff are as follows: W. D. York. . .''

Paragraph 3. of said statement reads:

"The Board of Directors of the Coastal Industrial Water Authority has heretofore determined the necessity for and ordered the acquisition by the Coastal Industrial Water Authority of the fee simple title to the following described land, said land being located in Harris County, Texas and being more particularly described as follows, to-wit: All that certain tract or parcel of land in the Arthur McCormick Survey, A-46, Harris County, Texas, containing 24.73 acres, more or less, and being all of that same 28.083 acre tract conveyed by C. Realty Company to W. D. York, et al, in deed dated November 17, 1961, recorded in Volume 4554, page 475 of the Deed Records of Harris County, said 24.73 acre tract is more particularly described (with bearings referred to Texas Co-ordinate System South Central Zone) by metes and bounds as follows: . . .''

There follows a description of the land to the water's edge as it existed on August 2, 1970. Paragraph 4 of this statement contains the allegation that the plaintiff has been unable to agree "with the said owner or owners upon the value of the land or damages".

As required by statute the Judge of the County Court at Law thereafter appointed special commissioners to assess the damage caused by the taking. The evidence reflects that the commissioners qualified, duly held a hearing on damages and assessed the amount of damages to be paid by Coastal at the sum of $100,000.00. The amount of the award was duly deposited in the registry of the court. York and the other defendants in the condemnation suit timely filed objections to the award of the special commissioners and thereafter withdrew the $100,000.00 in accordance with an order of the judge of the county court at law. These instruments contain admissions that York et al hold title to the land conveyed to them by C. Realty Company and were properly admitted into evidence as evidence of York's title.

■ At the time of the trial of this case the condemnation proceedings had become a civil case by reason of the filing of objections to the commissioners' award. *In the condemnation suit Coastal asserts* that York et al are the owners of the property conveyed to them by C. Realty Company. As a result of these proceedings Coastal has acquired possession of the property involved in this suit. Since these facts are conclusively established, Coastal is judicially estopped to deny the title of York to that portion of the property in question above the water line. Long v. Knox, 155 Tex. 581, 291 S.W.2d 292 (1956); Franklin v. Smith, 265 S.W. 715 (Tex.Civ.App.—Galveston 1924, writ ref'd); Busbice v. Hunt, 430 S.W.2d 291 (Tex.Civ.App.—Tyler 1968, writ ref'd n. r. e.).

■ The principal question in this case is whether or not an individual who has a valid title to land derived from the State of Texas bounded by the water's edge of a navigable stream within tide water limits loses title by reverter to the State of Texas, or its agency, of such portion of said land as may become submerged by the waters of said navigable stream. It is settled that *the State may grant a valid title to* submerged land subject to the ebb and flow of the tides. State v. Lain, 162 Tex. 549, 349 S.W.2d 579 (1961); State v. Aransas Dock & Channel Company, 365 S.W.2d 220 (Tex.Civ.App.—San Antonio 1963).

In Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438 (1932), Chief Justice Cureton discussed in great detail the rights of riparian owners of land. In this opinion, he stated:

". . . the right of the riparians to succeed the state in title to the river bed by reason of such occurrence (an avulsive change) was a vested one, part of the original grants when they were made

by the government of Mexico, just as were the rights to alluvion by accretion and adjacent soil uncovered by reliction."

Judge Cureton further states:

"The authorities all agree that under both the civil law (including the Mexican civil law) and the common law, when a river by erosion occupies land previously unoccupied by it, the owners lose title; that is, the boundary line between the coterminous estates follows the movement of the stream, with the result that one owner loses land by erosion, and the other acquires land not previously owned by him, by accretion or reliction. . . ."

The court also stated:

"In the *tidewater sections* of navigable streams the king, it is said, owned the rivers, including the beds, but held them in trust for the public. . . This ownership, however, was based, not upon navigability alone, *but upon the sovereign's ownership of the sea.* In so far as the tide ebbed and flowed, the rivers were regarded as arms of the sea, and since the king was lord of the sea, he was proprietor of the land beneath it. . . ."

The court then held:

". . . the claimed rule of the common law, that the abandoned beds of tidal rivers become the property of the sovereign, was not adopted in this state *as to our streams above the ebb and flow of the tide;* . . ."

In Maufrais v. State, 142 Tex. 559, 180 S.W.2d 144 (1944), the court held:

"However, in this state it has been held that where a navigable river by the process of avulsion leaves its old bed and cuts a new bed through land owned by a person in fee simple, such person loses his title to so much of his land as is occupied by such new bed, and the riparian owners of land abutting on the abandoned bed are entitled to claim such abandoned bed. . . . It logically follows that where a navigable river by avulsion cuts a new bed in addition to its old bed, and part of the normal flow of such river flows through such new bed, the owner of the land loses his title to so much of his land as is occupied by such new bed; but he does not lose his title to the land originally owned by him lying between the new and old beds."

In State v. Balli, 144 Tex. 195, 190 S. W.2d 71, 100 (1944), the court said:

"Thus the seashore was no part of the land, but always an adjunct of the sea. The classification of the sea and the shores of the sea as common property is as old as the oldest Roman law, but by its very nature and meaning there could never be an accession to the seashore as the seashore was defined in the law of Spain, which was effective in Tamaulipas when the grant in this case was made. . . .

"Since there could be no accession to land below tidewater, any change in the tide line ipso facto changed the seashore. If the sea encroached and the upland owner lost his land, he had no redress; if alluvion formed adjoining the seashore, the latter receded with the tide line, and by the very nature of the accretion any new alluvion which formed above the tide line should become a part of the contiguous upland estate."

It is well settled that notwithstanding the rapidity and suddenness of changes in the channel of a navigable river, so long as the soil is eroded so as to become the locus of the river's bed, the ordinary rules with reference to erosions and accretions apply. Where land belonging to an individual is taken into the bed of a navigable stream by reason of erosion, the title to such land is entirely lost. Hancock v. Moore, 135 Tex. 619, 146 S.W.2d 369 (1941).

In the case of Crary v. Port Arthur Channel & Dock Co., 92 Tex. 275, 47 S.W.

967, the court stated that the term "the waters of the Gulf" was sufficiently broad to embrace at least all the bays, inlets, and streams upon the Gulf coast, to the extent to which they are subject to the ebb and flow of the tide. In City of Galveston v. Mann, 143 S.W.2d 1028 (Tex.1940) a suit to mandamus the Attorney General to approve a bond issue for the purpose of erecting a pier off Galveston Island over submerged land which in the past had been upland and under private ownership and to extend out into the waters of the Gulf, the court refused the mandamus. In so doing the court stated that the erection of such a pier over and under the tide waters of the Gulf and into the deep waters of the sea would be an encroachment, at least, upon the prima facie property rights of the sovereign so far as the tide lands were concerned and an encroachment upon the unquestioned property rights of the State insofar as such structure was projected out into the deep waters of the sea. The court stated that the Attorney General would default in his obligation to the State if he were to approve a bond record which showed that the bonds were voted for the purpose of paying for the construction of permanent structures upon land which belongs to the State of Texas, or apparently belongs to the State, and for the erection of which structure no right or permit had been obtained.

In Diversion Lake Club ·v. Heath, 126 Tex. 129, 86 S.W.2d 441 (1935), the Supreme Court apparently accepted without question the proposition that the bed of a lake created by artificial means so as to submerge privately owned lands with the waters of a navigable stream, the bed of such stream becoming thereby a part of the bed of the lake so created, remained privately owned despite the fact that the water was public water, the court saying:

"This position is untenable, because the water of the lake, notwithstanding the fact that most of its bed is privately owned, is still public water."

The Court of Civil Appeals at Beaumont, in Fisher v. Barber, 21 S.W.2d 569, a no writ history case, held:

"As no part of the lands in controversy was covered by navigable waters at the time the titles were issued, the lands in their entirety were subject to grant, and the original grantees acquired good and valid titles thereto to the full extent of the defined boundaries, which titles were regularly transferred to appellee and owned and held by him at the time of the trial of this case. That a portion of these lands, to wit, the land lying under the waters of Wet marsh and the waters of the two bayous, became subject to the ebb and flow of the tides of Trinity Bay, thereby converting them into and making them a part of the navigable waters of Trinity Bay, did not deprive appellee of the title to that portion of his lands so submerged. He remained the legal owner and holder of all the land claimed by him to the utmost extent of his boundaries."

Citing Fisher v. Barber, supra, the Court of Civil Appeals at Galveston, in Fitzgerald v. Boyles, 66 S.W.2d 347, a case decided in 1931 in which the writ of error was dismissed, opinion by Chief Justice Pleasants, said:

"We do not think it can be doubted that, if the land in controversy was west of the shore line of Galveston Bay when the Hunter grant was originally surveyed and located, the grantee and those holding under him have not lost title to the land by the encroachment thereover of the waters of the bay, and whenever the land so submerged, either by natural causes or lawful artificial means, was restored to its original condition, the right to its possession and occupancy by the holders of the original title became paramount."

While, on motion for rehearing, Chief Justice Pleasants recognized that the proposition of law above stated was not established law in that the case cited did not

reach the Supreme Court of Texas, nevertheless it represents the thinking of an eminent legal scholar and is persuasive.

■ Since there is little, if any, authority on the question, we think the better rule to be that where lands are validly granted bordering on the seashore, or an arm thereof, or other navigable waters, and therefore passed into private ownership, the mere fact that a portion of such lands have become submerged by a body of navigable water does not deprive the owners of their title to the land as long as the boundaries can be reasonably identified. State v. West Tennessee Land Company, 127 Tenn. 575, 158 S.W. 746 (1913); City of Chicago v. Ward, 169 Ill. 392, 48 N.E. 927 (1897).

■ The legislature of this State has in the past authorized grants of land, including in the grant both fast land and submerged land. It would be illogical to assume that the legislature in making such a grant intended to reserve title to such part of the fast land as might subsequently become submerged creating islands or pockets of State owned land within the grant. Neither do we think the interests of the State would be served by discouraging efforts of owners of land lost to the sea by gradual submergence to reclaim it by artificial means. The trial court properly decreed that York et al were the legal owners of 28.083 acres of land out of the A. McCormick Survey in Harris County, Texas, and that said land was taken by defendant on said date. The trial court erred, however, in ordering the issuance of an execution against Coastal for costs. City of Houston v. Hamons, 496 S.W.2d 662 (Tex.Civ.App.—Houston [14th], 1973, ref'd n. r. e.).

The trial court did not err in overruling appellant's motion that appellant be awarded title to the 3.353 acres in dispute under its alternative cross-action in eminent domain. In State v. Nelson, 160 Tex. 515, 334 S.W.2d 788 (1960), the court said:

" . . . Subject to jurisdictional limitations, there is no reason why the rule which permits pleadings to be amended should not apply to the proceeding after it has become a case in court. . . .

" . . .

"Since the Legislature has not seen fit to give the county court original jurisdiction in eminent domain proceedings, such court does not have unlimited power to enlarge the subject matter of a particular cause by allowing amendments to the pleadings. It could not, for example, acquire by amendment the power to condemn land which is not described in the statement for condemnation and where there is nothing in the statement to suggest that the condemning authority intended to take the same. This is not to say that the court can never order the condemnation of any land other than that which would be conveyed if the description appearing in the statement were used in a deed.

" . . .

"Where the original statement contains a legally adequate description, the subject matter of the proceeding is not restricted to that which would be conveyed if such description were used in a deed but extends to all property and rights which under any possible construction can fairly be said to be involved. If the matter goes to judgment without amendment, the court should condemn only the property described in the statement. But when it develops during the trial on appeal that there are discrepancies in the description, the trial court has power to and should permit an amendment eliminating the same provided this can be done without material prejudice to the landowner . . ."

■ In its statement of taking Coastal has clearly shown its intention to take all of the property owned by York including the submerged tract in question. By rea-

son of the proceedings in condemnation *Coastal* has taken possession of the tract in question. Under these circumstances the county court acquired jurisdiction of the controversy and is entitled to proceed to judgment. Thompson v. Janes, 151 Tex. 495, 251 S.W.2d 953 (1952).

Coastal has presented other points of error which have been carefully considered. None of the points present reversible error.

The judgment of the trial court is reformed by eliminating therefrom the provision ordering execution for costs and as reformed is affirmed. One-fourth of the costs on appeal will be taxed against appellees.