TAPOCO, INC., Appellee,

*v.*

RUBEN F. PETERSON et al., Appellants.

TAPOCO, INC., Appellee,

*v.*

DONALD REEVES et al., Appellants.

373 S.W. 2d 605

(*Knoxville,* September Term, 1963.)

Opinion filed December 5, 1963.

AMBROSE, WILSON & SAULPAW, Knoxville, for appellants.

KRAMER, DYE, McNABB & GREENWOOD, Knoxville, R. R. KRAMER, R. ARNOLD KRAMER and CARTER B. WALL, Knoxville, for appellee.

MR. JUSTICE WHITE delivered the opinion of the Court.

These cases are before us on certiorari from the Court of Appeals. They have been argued at the bar of this Court. Excellent briefs have been filed by counsel for the respective parties.

These suits were brought originally by Tapoco, Inc., in the Chancery Court of Monroe County, to secure a mandatory writ of injunction requiring the defendants to remove their houseboats from Chilhowee Lake for the reason set out in the bills. The chancellor granted the relief prayed and the defendants appealed from his action. The Court of Appeals affirmed.

In view of the unusual importance of these cases we felt an obligation to hear and consider the matters in controversy. We are of the opinion that the Chancellor and the Court of Appeals have reached the proper decision in disposing of these cases.

The Court of Appeals has correctly stated the facts of these cases and the law applicable thereto in the opinion prepared for the court by Judge McAmis, the Presiding Judge. Therefore, we adopt it as the opinion of this Court, viz.:

"Tapoco, Incorporated, a wholly owned subsidiary of the Aluminum Company of America, brought these actions in the Chancery Court of Monroe County to obtain a mandatory injunction requiring defendants to remove their houseboats from Chilhowee Lake. From a decree granting the relief sought by the bills defendants have appealed.

"Complainant, a public service corporation, prior to 1955, acquired the fee title to riparian lands along navigable portions of the Little Tennessee River. In that

year it obtained a license from the Federal Power Commission, a certificate of convenience and necessity from the Tennessee Public Service Commission and certain permits from the Tennessee Department of Public Health to construct and maintain on its riparian lands a dam across the Little Tennessee for the generation of hydroelectric power. The dam was completed in 1957, resulting in the impoundment of water known as Chilhowee Lake.

"After the formation of the Lake a number of houseboats including those of defendants were placed at various places on the Lake and anchored to the bed of the Lake or tied to the bank by means of steel cables attached to stumps and trees on complainant's riparian lands.

"After attempting without success to induce defendants to accept a license permitting their boats to remain on the Lake for a period of two years at which time they were to be removed by defendants, complainant filed the bills in these consolidated cases.

"Defendants answered the bills insisting that, since the River is a navigable stream, upon completion of the dam the Lake became a public body of water and that the subjacent lands thereupon became vested in the public at large and incapable of private ownership. It was further insisted that defendants' houseboats were placed and maintained on the Lake for recreational purposes within the purview of the following provisions of Article 7 of the license granted complainant by the Federal Power Commission:

"'So far as is consistent with proper operation of the project, the Licensee shall allow the public free ac-

cess, to a reasonable extent, to project waters and adjacent project lands owned by the Licensee for purpose of full public utilization of such lands and waters for navigational purposes, including fishing and hunting, and shall allow to a reasonable extent for such purposes the construction of access roads, wharves, landings, and other facilities on its land the occupancy of which may in appropriate circumstances be subject to payment of rent to the Licensee in a reasonable amount; Provided, that the Licensee may reserve from public access such portions of the project waters, adjacent lands, and project facilities as may be necessary for the protection of life, health, and property and provided further, that the Licensee's consent to the construction of access roads, wharves, landings, and other facilities, shall not without its express agreement place upon the Licensee any obligation to construct or maintain such facilities.'

"After a full hearing the Chancellor found that complainant is the owner in fee of the property on which defendants' houseboats are anchored and moored even though now submerged by a navigable body of water; that defendants are trespassers and have no right to maintain their houseboats on the Lake under the terms of the Federal license above quoted but, on the contrary, under the proof the maintenance of their boats interferes with the recreational use of the Lake by others for fishing, boating and skiing. The Chancellor further held that the easement or right of the public for navigation or commerce does not entitle defendants to permanently or semi-permanently maintain their houseboats on the Lake.

"The foregoing findings and conclusions are challenged by defendants' assignments of error, the first of which is that the Chancellor erred in holding that com-

plainant is still the owner of the subadjacent land and is entitled to the possession thereof. Both parties rely upon the Reelfoot Lake Cases, 127 Tenn. 575, 158 S.W. 746, to maintain their respective claims with respect to the ownership of lands underlying a navigable body of water.

"In that case the State of Tennessee brought suit against the holders of the title to various tracts of land inundated as the result of an earthquake in 1810. Titles to some of the tracts were traceable to grants from the State of North Carolina prior to that date. Other portions of the land were still owned by the State of Tennessee when the lake was formed.

"The Court found the lake to be a technically navigable body of water and that as a result the public acquired the ownership of both the water and the land thereunder, such lands under Tennessee law not being capable of private ownership. The Court applied this doctrine as to all lands still owned by the State of Tennessee when the lake was formed but refused to apply it to lands at that time privately owned. We quote from the majority opinion:

" '* * * As these lands were grantable by North Carolina, and were subject to private ownership before the formation of the lake, we are of opinion that the mere fact that they have since become submerged by a body of navigable water does not deprive the owners of their title to the land as long as they can be reasonably identified.'

"The Court buttressed its conclusion as to the lands privately owned by citing approvingly *McCullough v. Wall*, 4 Rich. Law, 68, 53 Am.Dec. 715, in which the Su-

preme Court of South Carolina held that privately owned lands covered by a non-navigable stream did not lose their character as such and become public lands when the stream became navigable as the result of canals built by the State of South Carolina.

''The opinion then continues:

'' 'The foregoing authority, however, has no application to grants claimed by the defendant to other portions of the lake, which were issued after the lake was formed. This portion of the lake is governed by the rule stated in *Elder v. Burrus* [6 Humph. 358,] and *Stuart v. Clark,* supra, [2 Swan, 9,] and was not grantable. The state not having parted with its title to the land before the lake was formed, it thereafter held the waters of the lake and the lands under them in trust for all the people, and could not grant them away.'

■ ''The effect of this holding is that land which in its natural state was not covered with a navigable body of water when granted retains its character of private property when by the force of nature thereafter exerted it becomes submerged by a navigable body of water.

■ ''Does this principle apply when privately owned lands not servient to the burden of a navigable body of water become submerged by such a body of water as the result of private improvements made by the owner? If this question is answered in the affirmative it is clear that defendants' houseboats are on lands still owned by complainant since, under the proof, they are located at least 400 feet from the bed of the stream as it existed prior to the construction of the dam. We are of opinion, whatever the effect as to uses strictly public in nature, the encroachment of the water resulting from such im-

provement upon privately owned lands does not effect a forfeiture of title or subject such lands to uses by the public for which the original stream was not suited prior to the improvement, such as houseboats owned by private persons made stationary by moorings attached to the land.

"This conclusion finds support in *Federal Power Commission v. Niagara Mohawk Power Corporation*, 347 U.S. 239 (1953), 74 S.Ct. 487, 98 L.Ed. 666, where it was said in respect to the Federal Power Act, 16 U.S.C.A. sec. 791a et seq.:

" 'The Act treats usufructuary water rights like other property rights. While leaving the way open for the exercise of the federal servitude and of federal rights of purchase or condemnation, there is no purpose expressed to seize, abolish or eliminate water rights without compensation merely by force of the Act itself.

" 'The references in the Act to preexisting water rights carry a natural implication that those rights are to survive, at least until taken over by purchase or otherwise. Riparian water rights, like other real property rights, are determined by state law. Title to them is acquired in conformity with that law. The Federal Water Power Act merely imposes upon their owners the additional obligation of using them in compliance with that Act.'

" 'An artificial condition of a stream or other body of water may become a natural or normal condition as respects public rights. It has been stated, however, in this connection, that it usually requires conduct amounting to dedication or abandonment to give the public rights in an artificial condition of a body of water created by

private enterprise, for the reason that the public right in a stream is ordinarily measured by the condition of the stream in its natural state.' 56 Am.Jur. 702, Waters, Section 244.

"We are of opinion the rights of defendants to maintain their houseboats on the Lake must, therefore, turn upon a construction and application of Article 7 of the license above quoted.

"Under it complainant as licensee is required to allow the public reasonable access and use of the project waters for navigation and recreational purposes. What is a reasonable use is a question of fact.

"We have referred to the Chancellor's finding that houseboats interfere with the recreational use of the Lake by others. We concur in that finding.

■ "The Chancellor's finding is well supported by the testimony of W. H. Kennedy and Claude W. Nash who are, respectively, in charge of recreational uses of lakes under the jurisdiction of the Tennessee Game and Fish Commission and Tennessee Valley Authority. Their experience relates, among other things, to the problem of houseboats on lakes open to the public for recreational purposes. From their testimony it appears that houseboats moored to the shores of the lake usually in coves as defendants' boats are, do interfere with public recreational uses of such lakes for fishing, boating and skiing and that for this reason the policy of both the Commission and T.V.A. is to place time limits upon their being moored at a given location and discourage the use of lakes for this purpose.

"Mr. Kennedy testified that because houseboats are customarily moored in coves they tend to preempt such

choice fishing locations; that they cause problems of sanitation on the lakes and 'definitely detract from its over-all use in the public interest for recreational purposes' and that for these reasons the Commission is in the process of removing all houseboats from Reelfoot Lake.

■ ''We think the Chancellor rightly held that defendants have maintained their boats permanently or semi-permanently at their present locations. One of the boats has never been moved. The other has been moved only once. In mooring and maintaining them as shown defendants are committing a continuing trespass which a court of equity will act to enjoin at the instance of one having title to the land. *Pepper v. Gainesboro Telephone Company,* 1 Tenn.App. 175; *East Tennessee Natural Gas Co. v. Peltz,* 38 Tenn.App. 100, 270 S.W.2d 591; *Scott v. Goss,* 43 Tenn.App. 659, 311 S.W.2d 326.''

Therefore, the decision of the Court of Appeals is affirmed and this case is remanded for further proceedings not inconsistent with this opinion.

BURNETT, CHIEF JUSTICE, DYER and HOLMES, JUSTICES, and CLEMENT, SPECIAL JUSTICE, concur.