**COASTAL INDUSTRIAL WATER AUTHORITY, Petitioner,**

v.

**W. D. YORK et al., Respondents.**

**No. B–5256.**

Supreme Court of Texas.

Jan. 28, 1976.

Rehearing Denied Feb. 25, 1976.

---

Jonathan Day, City Atty., Fred Spence and Clifton E. Speir, Asst. City Attys., Houston, for petitioner.

951

Liddell, Sapp, Zivley & Brown, John C. Nabors and Christopher B. Allen, Houston, for respondents.

REAVLEY, Justice.

The question here is the ownership of riparian land which has subsided or sunk slowly beneath the water level of the Houston Ship Channel. Coastal Industrial Water Authority sought in a related action to condemn land owned by W. D. York et al., and a dispute arose as to whether the condemnor was required to take and pay for 3.353 acres which on the date of taking was submerged on the fringe of the Ship Channel. The condemnation suit was stayed until the title question could be resolved. York et al. then filed this declaratory judgment suit in district court to resolve the question of the line between public and private ownership. The trial court entered judgment which upheld York's claim to ownership to the 3.353 acres as of the date of taking. The Court of Civil Appeals agreed (520 S.W.2d 494), and so do we.

The material facts are not in dispute. York's land lies near the San Jacinto Monument in an area where the land surface has been slowly subsiding during the last several decades. The precipitating cause of this subsidence is the removal of enormous amounts of underground water for purposes of industrial and municipal use. As the water is removed the sub-surface pressure is reduced, which causes layers of inelastic clay to compact. The result is the

loss in surface elevation. As the land subsides, adjacent waters encroach upon and submerge the land.

Land in the immediate area of the York tract has subsided some nine feet in the past seventy years. See generally, Steelhammer & Garland: Subsidence Resulting From The Removal of Ground Waters, 12 So.Tex.L.J. 201 (1971). The water of the Houston Ship Channel moved upon this particular tract for a number of years prior to 1950, but our interest begins as of that year when a survey showed 28.083 acres standing above the water level. In 1961 a survey revealed that there was then 26.44 acres above the water level. At the time of the taking by the condemnor, Coastal Industrial Water Authority, on August 4, 1970, there was only 24.73 acres above the water level. It is the position of Coastal that York then owned only the dry 24.73 acres, while York contends that he and the other plaintiffs owned and were entitled to be compensated for the entire 28.083 acres originally conveyed to them.

The Houston Ship Channel is a navigable stream. Its bed was owned by the State but relinquished to the City of Houston as the result of Article 7467a, Vernon's Ann. Civ.St. The testimony of the surveyor witnesses indicates that the level of the water upon the York land does not fluctuate with the ebb and flow of the tide, and we will assume that the tide has no effect at this point.[1]

█ It might be expected that part or all of the 3.353 acres in controversy would have

1. York's tract lies at the confluence of the San Jacinto River and the Houston Ship Channel (known also as Buffalo Bayou). There is a statement volunteered by one of the witnesses indicating that the site is reached by the Gulf tide. Indeed, it may be that subsidence may pose no boundary problem for navigable streams above sea level. The Court of Civil Appeals opinion states that the question in this case concerns title to land bounded by water "within tide water limits." 520 S.W.2d 499. The parties have not, at any point in this litigation, made any reference to the fact or legal effect of the tide. For this reason the

Court's opinion is restricted to the issues presented by the peculiar facts of this record and the contentions of these parties. The writer of this opinion, speaking personally, chooses to emphasize the narrowness of the holding and to warn against any misinterpretation of its effect upon the boundary of private ownership to lands within reach of the tide. There may be cases where the private development and use of land will require a holding that the ownership is not changed by submergence under tidewater due to subsidence. There may be cases where public rights are not prejudiced by permitting title to remain unchanged un-

been washed by the current of the water until the soil eroded and passed away so as to leave this three acre area indistinct from the bed of the ship channel. If that were the case, ownership would have been lost to the riparian owner (York et al.) and passed to the City of Houston under the authorities to be discussed. As this case is presented to us, however, there has been no displacement of the submerged land in relation to the bed of the ship channel. York and the 1970 surveyor both testified that the 3.353 acres was covered by only shallow water. The Court of Civil Appeals applied a rule in favor of York which assumes the identification of the boundaries of the 28.-083 acres. Coastal has not contested this issue; it claims no erosion of the shelf which has subsided slightly below water level. We therefore assume that the 3.353 acres has subsided beneath the water level but that there has been no erosion of that submerged 3.353 acres.

■ The general rule is that a riparian or littoral owner acquires or loses title to the land gradually or imperceptibly added or taken to or from his fast bank or shore. Erosion is the process of wearing away the land. Accretion is the process of gradual enlargement of the fast land. *Giles v. Basore,* 154 Tex. 366, 278 S.W.2d 830 (1955); *State v. Balli,* 144 Tex. 195, 190 S.W.2d 71 (1944); *Lakefront Trust, Inc. v. City of Port Arthur,* 505 S.W.2d 606 (Tex.Civ.App.1974, writ ref'd n. r. e.).

■ A different rule is usually applied in case of the sudden removal or deposit of land, the rapid or perceptible change being termed avulsion. It is often held that title does not pass by avulsion. *City of New York v. Realty Assoc.,* 256 N.Y. 217, 176 N.E. 171 (1931) (where storms tore away a large tract and after submergence under the ocean for 30 years, it was held that the riparian owner retained title); *City of Chicago v. Ward,* 169 Ill. 392, 48 N.E. 927 (1897) (where land torn away and submerged by waters of Lake Michigan was successfully reclaimed by riparian owner); *Schwartzstein v. B. B. Bathing Park,* 203 App.Div. 700, 197 N.Y.S. 490 (1922) (since the change in the shoreline was sudden and not gradual, the ownership boundary did not change); 5A Thompson on Real Property (Grimes ed. 1957) § 2561; see, *Maufrais v. State,* 142 Tex. 559, 180 S.W.2d 144 (1944); *Denny v. Cotton,* 3 Tex.Civ.App. 634, 22 S.W. 122 (1893, writ ref'd), 60 Tex. Jur.2d Waters § 296. A sudden change in the course of a river will result in a change of ownership of the old and new beds but not in the upland between the old and new courses. *Manry v. Robison,* 122 Tex. 213, 56 S.W.2d 438 (1932); *Maufrais v. State, supra.*

■ There is some dispute between the parties as to the significance of the artificial or man-made cause (*i. e.* the withdrawal of underground water) of the subsidence. We place no significance upon the relation between artificial and natural causes of this phenomenon. A riparian or littoral owner may not acquire title to submerged land through self-help by filling and raising the land level (*Lorino v. Crawford Packing Co.,* 142 Tex. 51, 175 S.W.2d 410 [1943]); however, there is no reason to apply a different rule for the effects of subsidence simply because of the activities of cities and industries over which these landowners have no control. See generally: *Bonnelli Cattle Co. v. Arizona,* 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973); Dinkins, Texas Seashore Boundary Law: The Effect of Natural and Artificial Modifications, 10 Houston

til the private owner has a reasonable opportunity to reclaim his land from the sea. However, the rule of *Luttes v. State,* 159 Tex. 500, 324 S.W.2d 167 (1958) stands. I doubt that a court would accept a rule that located the boundary of private ownership at the Luttes line *as of the time when non-*

*avulsive subsidence commenced.* That rule would allow private owners generally to hold title to land under the sea, would restrict the enjoyment of public beaches, and would make the location of seaward boundaries an exercise of pure guesswork.

L.Rev. 43 (1972); 78 Am.Jur.2d Waters § 410; 5A Thompson on Real Property (Grimes ed. 1957) § 2560, p. 605; Annot., 63 A.L.R.3d 249 (1975).

Our immediate question is not whether a riparian owner may acquire ownership of additional land but whether the submergence of land to which he has title necessarily divests him of that title. There have been cases approving private ownership of soil beneath navigable water. *State v. Lain,* 162 Tex. 549, 349 S.W.2d 579 (1961); *State v. Bradford,* 121 Tex. 515, 50 S.W.2d 1065 (1932); *State v. Aransas Dock & Channel Co.,* 365 S.W.2d 220 (Tex.Civ.App.1963, writ ref'd); *City of Galveston v. Menard,* 23 Tex. 349 (1859). It should be noted that the Court in *City of Galveston v. Menard* distinguished between property under navigable waters which should be reserved for public use and other property under those waters in which the public use and enjoyment "may be promoted and increased, by allowing portions of it to become private property." 23 Tex. 393.

Two court of civil appeals decisions have sustained continued private ownership of land despite its submergence under waters of bays of the Gulf. In *Fitzgerald v. Boyles,* 66 S.W.2d 347 (Tex.Civ.App.1933, writ dism'd) the court wrote:

> [I]f the land in controversy was west of the shoreland of Galveston Bay when the Hunter grant was originally surveyed and located, the grantee and those holding under him have not lost title to the land by the encroachment thereover of the waters of the bay, and whenever the land so submerged, either by natural causes or lawful artificial means, was restored to its original condition, the right to its possession and occupancy by the holders of the original title became paramount. 66 S.W.2d 349.

In *Fisher v. Barber,* 21 S.W.2d 569 (Tex.Civ. App.1929, no writ) the court upheld plaintiff's title to land submerged by the water flowing from Trinity Bay. Neither of these

two opinions (*Fitzgerald v. Boyles* and *Fisher v. Barber*) discuss the gradualness or suddenness of the changes that led to submergence of the land, nor do they indicate that the avulsion rule had any bearing upon the holdings. The *Fitzgerald* opinion mentions the occurrence of storms over a period of fifty to sixty years, and the *Fisher* opinion recites that the land was opened to the tidewaters by the digging of a channel. Neither court ascribes significance to these facts.

It is usually held that the title to land is not changed by its being submerged beneath a lake, even though the public has rights in and upon the navigable waters of the lake. *Schulte v. Warren,* 218 Ill. 108, 75 N.E. 783 (1905); *Tapoco, Inc. v. Peterson,* 213 Tenn. 335, 373 S.W.2d 605 (1963); *State v. West Tennessee Land Co.,* 127 Tenn. 575, 158 S.W. 746 (1913). The Illinois court in *Schulte v. Warren* based its holding upon the fact of avulsive or sudden flooding, but the rule or fact of avulsion was not mentioned by the Tennessee courts. The court simply stated in *State v. West Tennessee Land Co.*:

> It would seem, on principle, that the title to the land would be unaffected by the formation of the lake, and its owners would be entitled to its use and its enjoyment as long as they can reasonably identify it and fix its boundaries. 158 S.W. 752.

A case of this type was decided by the Supreme Court of Texas in *Diversion Lake Club v. Heath,* 126 Tex. 129, 86 S.W.2d 441 (1935). A dam was constructed upon a navigable stream, and the controversy ensued over the right of the public to fish in the lake that was created. While applying the civil law rule that beds of navigable streams are publicly owned and holding, accordingly, that the public enjoys the right to fish in all navigable water (contrary to the common law rule), the court said that the bed of the lake, apart from the bed where the river had flowed, was privately owned. No mention was made of the rule of avulsion.

We reaffirm the rules with respect to property loss and gain due to erosion and accretion. It is clear from the cases, however, that submergence does not necessarily destroy the title of the owner. It is sometimes said that there must be a "transportation of the land beyond the owner's boundary to effect that result." 5A Thompson on Real Property (Grimes ed. 1957) § 2562. There has been no erosion or transportation of the York land—only a subsidence. This is not an ordinary hazard of riparian ownership; it is not the result of the force of the waters which takes from some owners and gives to others. So long as the general public or a public body has not come to use the site for navigation, thereby raising a conflict between private and public interests which does not exist in the present case, it is consistent with the interests of all to permit the riparian owner to protect his land—rather than to watch helplessly as his boundary retreats. We hold that title to the 3.353 acres remained in York et al. on the date of the taking in 1970.

The judgments below are affirmed.

DANIEL, J., concurs in the result of this opinion.