

# THE ATTORNEY GENERAL
## OF TEXAS

JIM MATTOX
ATTORNEY GENERAL

December 22, 1989

Honorable Lloyd Criss                    Opinion No. JM-1123
Chairman
Labor & Employment                       Re: Ownership of an artifi-
   Relations Committee                   cially restored beach, and
House of Representatives                  related questions  (RQ-1767)
Austin, Texas  78769

Dear Representative Criss:

You ask about the ownership of beach property that has been "artificially restored":

> After beach property has been reclaimed and restored, does it belong to the owner prior to its submersal, or does it remain the property of the State?

Except where valid grants have been made, the State of Texas has title to all submerged lands of all bays, inlets, and other waters along the Gulf of Mexico. City of Port Isabel v. Missouri Pacific R. R., 729 S.W.2d 939 (Tex. App. - Corpus Christi 1987, writ ref'd n.r.e.) (citing Lorino v. Crawford Packing Co., 175 S.W.2d 410 (Tex. 1943); Butler v. Sadler, 399 S.W.2d 411 (Tex. Civ. App. - Corpus Christi 1966, writ ref'd n.r.e.)), see also Attorney General Opinion C-52 (1963) (title to submerged littoral property transferred by state to City of Corpus Christi). The dividing line between state ownership of submerged land and private ownership of the upland is the line of mean high tide for patents issued on or after January 20, 1840, the date the Republic of Texas adopted the common law of England. Rudder v. Ponder, 293 S.W.2d 736 (Tex. 1956). For grants made prior to January 20, 1840, the dividing line under the Spanish or Mexican civil law then in effect -- the line of "mean higher high tide" -- would apply in determining the seaward boundaries of littoral tracts. Luttes v. State, 324 S.W.2d 167 (Tex. 1958).

The location of the shoreline, i.e. the applicable high tide line, changes due to the action of wind, water, and other forces. For example, "accretion" is the natural process of gradual addition of soil (or "alluvion") to the shore. Where dry land is added seaward by accretion to an upland owner's tract, the upland owner acquires title to the

dry land thus added. See, e.g., Humble Oil & Ref. Co. v. Sun Oil Co., 190 F.2d 191, 196 (5th Cir.), reh'g denied, 191 F.2d 705 (5th Cir. 1951), cert. denied, 342 U.S. 920 (1952) (citing State v. Balli, 190 S.W.2d 71 (Tex. 1944) "by the doctrine of accretion, any new alluvion that forms above the tide-line becomes a part of the contiguous upland estate"). Conversely, a littoral owner -- i.e. one whose property is bounded by the seashore -- loses title to land gradually eroded by an encroaching shoreline. City of Port Isabel, supra, at 943 (citing City of Corpus Christi v. Davis, 622 S.W.2d 640 (Tex. App. - Austin 1981, writ ref'd n.r.e.)). Thus, generally speaking, "the location of the shoreline, wherever it may be at any given time, represents the boundary of a littoral owner's property." Id. at 942. See generally Dinkins, "Texas Seashore Boundary Law: The Effect of Natural and Artificial Modifications," 10 Houston L.Rev. 43 (1972).

The framing of your question -- whether previously submerged and subsequently "restored" property "belong[s] to the owner prior to its submersal . . . or . . . remain[s] the property of the State" -- implies that title to the property in question is in the state at the point at which restoration is undertaken. No issue is before us as to when, or under what circumstances, title to submerged beach property might not be in the state.[1] Therefore, we will address whether a littoral property owner who has lost to the state title to a portion of his tract that has become submerged may regain title to such portion if it is subsequently artificially restored such that it is again above the applicable high tide line.

While title to submerged land would pass from the state to the adjoining upland owner if the property is raised by natural accretion above the high tide line, it appears to be the rule in Texas that title to land raised above the high tide line by artificial means would remain in the state. In Lorino v. Crawford Packing Co., 175 S.W.2d 410 (Tex. 1943), discarded oyster shells from an oyster house built up over time to raise previously submerged land above water level. The supreme court stated that "[a]ccretions along the shores of the Gulf of Mexico and bays which have been added by artificial means do not belong to the upland owners, but remain the property of the State." Id. at 414.

In 1974, the Beaumont Court of Appeals, in deciding that title to land eroded by encroaching lake waters was

---

1.  See footnote 2.

lost to the state and that title to an island later created at the same location by human agency was vested in the state, noted that the Lorino court had "held specifically that land which was added to the shoreline by artificial means does not belong to the upland owners but remained the property of the State."2 Lakefront Trust, Inc. v. City of Port Arthur, 505 S.W.2d 606, 608 (Tex. Civ. App. - Beaumont 1974, writ ref'd n.r.e.).

In 1976 the supreme court, in Coastal Indus. Water Auth. v. York, 532 S.W.2d 949, 952 (Tex. 1976), cited Lorino for the proposition that a "riparian or littoral owner may not acquire title to submerged land through self-help by

---

2. The Lakefront court in reaching its conclusion conceded that it had found two court of appeals cases, decided more than fifty years earlier, which suggested a different result, Fisher v. Barber, 21 S.W.2d 569 (Tex. Civ. App. - Beaumont 1929, no writ) and Fitzgerald v. Boyles, 66 S.W.2d 347 (Tex. Civ. App. - Galveston 1931, writ dism'd).

The Lakefront court concluded "that the subsequent Supreme Court cases cited in [its] opinion [including Lorino, supra] must be accepted as correct statements of law where in conflict with these two older cases of the Courts of Civil Appeals." Lakefront, supra, at 608-09.

The Fisher and Fitzgerald cases held that title to land was not lost to the state when the land became submerged. Your question assumes that title to the submerged land in question has been lost to the state, and we address here only the issue whether, once title is lost by submergence, it can be regained by raising the land again by artificial means above the high tide line. For your information, however, we note other cases following or suggesting theories under which title is not lost by submergence. See, e.g., Coastal Indus. Water Auth. v. York, 532 S.W.2d 949 (Tex. 1976) (title to riparian land, submerged due to subsidence, not lost to state); City of Corpus Christi v. Davis, supra, at 644 ("question of applicability of the doctrine of avulsion to tidal lands is of such prime importance that it should be determined by the Supreme Court, and not by this court [the Austin Court of Appeals]"); cf. Manry v. Robison, 56 S.W.2d 438 (Tex. 1932) (avulsive -- i.e. sudden -- change in course of river marking boundary between adjoining landowners does not alter boundary; an exception to the rule that property lines marked at shoreline follow changes in shoreline due to erosion or accretion).

filling and raising the land level." See also Luttes, supra, at 193 (attempt to distinguish to what extent certain lands in the Laguna Madre had been raised above high tide line by natural accretion and to what extent the raised level of the land was due to certain dredging, damming, and flood control operations, but on rehearing, the supreme court decided that the issue of natural versus artificial accretion was "not in the case"). Another pre-Lorino case, Curry v. Port Lavaca Channel & Dock Co., 25 S.W.2d 987, 988 (Tex. Civ. App. - San Antonio 1930, no writ), also suggested the significance of the natural versus artificial distinction in stating that the littoral lands in question there "could not be accretions, because not made up by gradual imperceptible process of nature, but . . . were really man made." See also Port Aransas Properties v. Ellis, 129 S.W.2d 699, 702 (Tex. Civ. App. - San Antonio 1939, writ dism'd judgm't cor.) (making natural versus artificial accretion distinction).

In light of the Lorino case and the other authorities cited, we conclude in response to your question that where title to submerged littoral land is in the state, raising the land above the tideline by artificial means does not effect a transfer of title to the adjacent upland littoral property owner. Title remains in the state.[3]

---

3. Your question, as submitted, reads in its entirety:

1) Who is the rightful owner of beach that has been artificially restored? After beach property has been reclaimed and restored, does it belong to the owner prior to its submersal, or does it remain the property of the State, or more accurately, of the General Land Office? (Emphasis added.)

We are uncertain of the import of the portion of your question that refers to the General Land Office, underscored in the above quote. Therefore, with regard to that part of your question, we note only that the Natural Resources Code section 11.041 states that "the arms and the beds and shores of the Gulf of Mexico within the boundary of Texas" are included in the permanent school fund. The Commissioner of the General Land Office has certain powers with respect to such property. See, e.g., Nat. Res. Code § 51.291, which authorizes the commissioner to execute certain

grants of easements for rights-of-way across unsold
(Footnote Continued)

Again, we caution that our disposition here is limited, as your question implicitly is, to circumstances where the state holds title to the submerged land when the artificial raising of the land is undertaken. We do not address here a situation where title to the submerged land was not in the state. Nor do we address a situation where federal property rights are involved. See, e.g., California ex rel. State Lands Comm'n v. United States, 457 U.S. 273 (1982) (federal common law applies where federal government owns uplands). Nor do we address questions as to the effect on rights, other than title, of artificial beach restoration -- e.g. the littoral right of access to the water. See, e.g., City of Corpus Christi v. Davis, supra, at 646.

Finally, we caution that we find no Texas authority determining a rule of title to artificially raised littoral property where the contiguous upland property was granted out of the sovereign prior to the Republic of Texas' adoption of the common law of England in 1840. The Luttes court ruled that the respective rights of the upland littoral owner and the state under an 1829 Mexican land grant were to be determined under the civil law in effect at the time of the grant. That court found that the applicable civil law rule as to title to natural accretions to littoral property was that the upland owner took title -- the same rule as that of the later Texas common law. The case is an example of the great difficulties in discovering, and determining the import of, such civil law rules. Lorino, supra, determined the common law, but not the civil law rule, with respect to the artificial raising of submerged land, but the court did not indicate whether littoral property granted out of the sovereign prior to the 1840 date might be subject to a rule different from the common-law rule applied in that case. Since you do not specifically ask about littoral properties which were granted out of the sovereign prior to January 20, 1840, we have not here attempted to determine whether a different civil law rule might apply in such cases as to where title to artificially restored beach property would lie.

You also ask:

Who is liable for damages caused by a dislodged breakwater or other man-made object?

---

(Footnote Continued)
public school land, the portion of the Gulf of Mexico within the jurisdiction of the state, and all islands, saltwater lakes, bays, inlets, marshes, and reefs owned by the state within tidewater limits . . . .

> A hurricane could feasibly force such an object ashore where it might destroy property or cause harm to individuals. In such a case, who holds responsibility for removing and/or replacing the object?

Your question is too broad for us to address in any detail. You do not indicate under what circumstances such a breakwater would be constructed or subsequently dislodged, or what parties might be involved in authorizing it, constructing it, maintaining it, or causing it to be constructed or maintained. Issues of governmental immunity might also be relevant. See Texas Tort Claims Act, Civ. Prac. & Rem. Code ch. 101.

### S U M M A R Y

Under the circumstances addressed, where title to submerged littoral land is in the state, raising the land above the tideline by artificial means does not effect a transfer of title to the adjacent upland littoral property owner. Title remains in the state.

Whether there would be liability for damages or other relief from harm caused by a dislodged breakwater would depend on the facts of the particular case.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by William Walker
Assistant Attorney General