# IN THE SUPREME COURT OF TEXAS

═══════════

No. 18-0264

═══════════

GEORGE P. BUSH, AS THE LAND COMMISSIONER OF THE TEXAS GENERAL LAND
OFFICE, PETITIONER,

v.

LONE OAK CLUB, LLC, RESPONDENT

═══════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

═══════════════════════

JUSTICE GREEN, joined by CHIEF JUSTICE HECHT, dissenting.

In resolving this title dispute as to who owns portions of the bed of the Lone Oak Bayou below the line of mean high tide, the Court charts a new path of Texas jurisprudence that departs from the long-standing distinction in Texas law between submerged land above the line of mean high tide and submerged land below the line of mean high tide. In doing so, the Court expands the scope of the Small Bill and the 1837 Navigable Stream Statute beyond the laws' plain language. Because Texas law recognizes State ownership of the beds of bodies of water below the line of mean high tide, I would hold that the General Land Office (GLO) owns title to the disputed submerged land in this case. Therefore, I respectfully dissent.

**I. The Ownership of the Beds of Tidal and Non-Tidal Bodies of Water in Texas**

The Court concludes that the 1837 Navigable Stream Statute and the Small Bill apply to submerged lands below the line of mean high tide. *Ante* at __. Because these statutes do not specifically address tidal influence, the Court reasons, the statutes must be read to apply to all bodies of water that meet the statutory definition of a "navigable stream" regardless of tidal influence. *Ante* at __. In support of this conclusion, the Court also relies on the Mexican civil law, which made no distinction between tidal and non-tidal navigable streams. *Ante* at __. But to reach its conclusion, the Court must disregard the long-standing differing treatment of submerged lands below the line of mean high tide in Texas law—a principle that dates back to Texas's adoption of the English common law in 1840—and must reject the fact that the common law and the civil law have worked in harmony to govern the ownership of submerged land in Texas for almost 200 years.

When Texas secured independence from Mexico in 1836, the Mexican civil law—which had been the law of the land in Texas—was not immediately replaced. *See* James W. Paulsen, *'Preserved from the Wreck': Lingering Traces of Hispanic Law in Texas*, 49 HOUS. LAW., Sept./Oct. 2011, at 11. Instead, the Mexican civil law remained the law of Texas until the Congress of the Republic of Texas enacted its own laws and then adopted the English common law in 1840, while retaining some elements of the Mexican civil law. *See id.* (discussing some remaining elements of the Mexican civil law in Texas, including certain aspects of Texas water law, after the Congress adopted the English common law). Under the Mexican civil law, the State "owned the beds of all perennial streams, regardless of navigability." *Manry v. Robison*, 56 S.W.2d 438, 446 (Tex. 1932) (emphasis omitted). The Mexican civil law treated all perennial streams—regardless of navigability

2

or tidal influence—the same: the State owned title to the stream beds. *See id.* ("Under the civil law, all perennial streams were public . . . .").

In 1837, the Texas Legislature enacted the Navigable Stream Statute. Act approved Dec. 14, 1837, 2d Cong., R.S., § 42, 1837 Repub. Tex. Laws 62, 76, *reprinted in* 1 H.P.N Gammel, *The Laws of Texas 1822–1897*, at 1412, 1418 (Austin, Gammel Book Co. 1898). This statute amended the Mexican civil law to prohibit land surveys from crossing navigable streams, which the statute specifically defined as "all streams [with an] average width of thirty feet." *Id.* Prohibiting these surveys protected the State's interest in navigable streams—an interest recognized by the civil law—ensuring that such streams would be held in trust for the public's use and enjoyment. *Id.* § 21, 1837 Repub. Tex. Laws 62,70, reprinted in 1 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 1412 (Austin, Gammel Book Co. 1898). Accordingly, after the passage of the 1837 Navigable Stream Statute, the State of Texas owned all the beds of perennial streams (under Mexican civil law), and it also "owned the beds of all streams . . . where the beds were as wide as 30 feet," under the 1837 Navigable Stream Statute. *Manry*, 56 S.W.2d at 446 (emphasis omitted).

In 1840, the Congress of the Republic of Texas adopted the English common law, only "so far as it [was] not inconsistent with the Constitution or the Acts of Congress" already in place at that time. Act approved Jan. 20, 1840, 4th Cong. R.S., § 1, 1840 Repub. of Tex. Laws 1, 3, *reprinted in* 2 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 177 (Austin, Gammel Book Co. 1898). Under the English common law, the sovereign owned title to the beds of bodies of water that fell *within* the "boundary of the sea"—that is, within the limits of the tide. *Rudder v. Ponder*, 293 S.W.2d 736, 741 (Tex. 1956). The "boundary of the sea" is "the mean high tide of the sea waters"

3

under the English common law. *Id.* The English common law's treatment of tidally influenced bodies of water was based "upon the sovereign's ownership of the sea." *Manry*, 56 S.W.2d at 446 (emphasis omitted); *see also id.* (citation omitted) ("In so far as the tide ebbed and flowed, the rivers were regarded as arms of the sea, and since the king was lord of the sea, he was proprietor of the land beneath it."). After 1840, the distinction between the civil law and the common law treatment of stream beds was thus as follows: "Under the civil law, all perennial streams were public, while under the common law navigable streams within tidewater limits only, in the absence of prescription, dedication, or act of Parliament, were public." *Id.* (citations omitted).

As we explained in *Manry*, at the time of the adoption of the English common law in 1840, the State owned title to the beds of all navigable streams in Texas "under the Mexican civil law as modified by the act of 1837." *Id.* Even after Texas adopted the common law, we continued to apply the civil law rule as to stream bed ownership above the tidewater. *Id.* at 447 (citations omitted) ("Subsequent to the adoption of the common law, we have ignored its rule that grants on streams above tidewater carry title to the thread of the stream, and have continued to apply the civil-law rule, of which the [Navigable Stream Statute] of 1837 is an adaptation, to the effect that the beds of streams there defined are the property of the State."). This was due in large part to different conditions—in England, where rainfall is plentiful, irrigation and access to water is not a serious concern; in arid Texas, like Mexico, however, irrigation and access to water are matters of great importance. *Id.* ("The civil law, therefore, which retained title to the beds of all perennial streams in the State, so that the impounding and distribution of waters might be better effectuated, was better suited to our conditions than the rule of the common law." (emphasis omitted)). In explaining what

4

parts of the common law we have adopted, we explained that "we have only adopted such rules of the common law as are suitable to our conditions and as are in harmony with the basic principles of our jurisprudence with reference to the law of waters." *Id.* This Court's opinion in *Manry* made clear that the line of mean high tide is important to Texas's jurisprudence; indeed, *Manry* leaves little doubt that the common law rule extends only to that line and no farther. *Id.* at 446–47 ("We are constrained to believe that the Congress of the Republic, in adopting the common law as a rule of decision, did not intend to adopt any rule of that system of jurisprudence *applicable alone to the beds of streams within tidewater limits* and apply it to thousands of miles of navigable and innavigable streams above the flow of the tide . . . .").

In *Manry*, we resolved the question of ownership of abandoned river beds above the line of mean high tide. *Id.* at 442. We concluded that the English common law rule that "abandoned beds of tidal rivers become the property of the sovereign[] was not adopted in this state as to our streams above the ebb and flow of the tide." *Id.* at 449 (emphasis omitted). Instead, we concluded "that the other clear rule of the common law, that abandoned river beds are the property of the riparian owners, regardless of navigability, should be applied to all our streams above tidewater, navigable in fact or in law; a rule in entire harmony with the Mexican civil law." *Id.* There is no reason to harmonize the common law and the civil law in the context of abandoned river beds, but refuse to do so in the context of submerged lands. The common law and the civil law work in harmony to provide a framework of rules governing ownership of the navigable streams in Texas: the 1837 Navigable Stream Statute and the Small Bill govern the ownership of navigable streams above the

5

line of mean high tide, and the common law governs the ownership of the beds of all bodies of water below the line of mean high tide.

To be sure, the 1837 Navigable Stream Statute and the Small Bill are silent as to their applicability to bodies of water below the line of mean high tide.[1] But the historical context of these acts makes clear that the consideration of the line of mean high tide is important to the analysis of which rule governs, as this Court's *Manry* opinion recognizes. *See id.* at 449 (specifying that the Court expresses no opinion on which rule applies below the line of mean high tide). Although the Navigable Stream Statute does not mention the tide, *Manry* characterizes it as an adaptation of the Mexican civil law—the body of law that applies to submerged land above the line of mean high tide. *See id.* at 446–47. In fact, as *Manry* suggests, any common law rule applicable only to submerged land below the line of mean high tide should not be applied to submerged land above the line of mean high tide. *Id.* at 447. However, applying the longstanding common law rule of sovereign ownership to submerged land below the line of mean high tide is consistent with the civil law and the Navigable Stream Statute. And we must interpret the Small Bill to effectuate the intent of the Congress of the Republic of Texas that the common law was adopted insofar as it was not inconsistent with statutes already in place at the time of the common law's enactment. *See* Act

---

[1] The 1929 Small Bill was enacted three years after this Court's decision in *Motl v. Boyd*, 286 S.W. 458 (Tex. 1926). The Court's construction of the 1837 Navigable Stream Statute in *Motl* was interpreted as categorizing a significant number of dry river beds as "navigable streams," making these streams essentially immune to private conveyance. *Id.* at 468. *Motl* dealt with the inland streams of Texas—specifically those near San Angelo—not the tidally affected waters near the coastline. *Id.* at 461. After *Motl*, thousands of acres of land in the dry parts of Texas became susceptible to title disputes between private property owners who believed they had acquired title to the banks of streams. *See* Wallace Hawkins, *Title to River Beds in Texas and Their Boundaries*, 7 Tex. L. Rev. 493, 501–02 (1929). The Small Bill's enactment on the heels of the *Motl* decision, and in response to the law already in place as a result of the 1837 Navigable Stream Statute, gives a clear expression of the Legislature's intended scope of the words "water course" and "navigable stream" in the Small Bill—that they do not encompass tidally influenced bodies of water, which are governed by the law derived from the English common law.

6

approved Jan. 20, 1840, 4th Cong. R.S., § 1, 1840 Repub. of Tex. Laws 1, 3, *reprinted in* 2 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 177 (Austin, Gammel Book Co. 1898). Because the Navigable Stream Statute does not specifically address bodies of water below the line of mean high tide, and we know that the line of mean high tide was significant in the common law, applying the civil law above the line of mean high tide and the common law below synthesizes the two sources of the law that govern ownership of submerged lands in our state.

Consistent with the notion of synthesizing the common law and the civil law on the question of ownership of submerged lands, this Court and other Texas courts have long acknowledged the distinction between land submerged under tidal waters and land submerged under inland streams and rivers above the line of mean high tide. *See, e.g.*, *Rudder*, 293 S.W.2d at 741 ("When the Republic of Texas adopted the common law of England on January 20, 1840, it adopted the common law as to the boundary of the sea . . . ."); *Seabrook Land Co. v. Lipscomb*, 331 S.W.2d 429, 433–34 (Tex. App.—Houston 1960, writ dism'd by agr.) ("The law is well established that in the tidewater sections of navigable streams, the sovereignty is the proprietor and owner of the land beneath the water."). In *Coastal Industrial Water Authority v. York*, 532 S.W.2d 949 (Tex. 1976), the Court decided a case that involved the ownership of land that had "sunk slowly beneath the water level of the Houston Ship Channel." *Id.* at 951. In reaching the conclusion in that case, Justice Reavley, author of the Court's opinion, cautioned that the opinion should be read narrowly and should not be applied to land below the line of mean high tide. *See id.* at 951 n.1 (providing this warning in a personal footnote at the beginning of the opinion). In *State v. Balli*, 190 S.W.2d 71 (Tex. 1944), the Court observed the distinction between seashore alluvion and the alluvion of rivers. *See id.* at 100

7

("Any distinction that can be drawn between the alluvion of rivers and accretions cast up by the sea must arise out of the law of the seashore rather than that of accession and be based . . . upon the ancient maxim that the seashore is common property and never passes into private hands.").

This Court's precedent also suggests that the Navigable Stream Statute has always applied only to submerged land above the line of mean high tide. In *City of Galveston v. Menard*, 23 Tex. 349 (Tex. 1859), the Court explained the civil law's treatment of submerged land: "By the civil law, the shores of the sea, of bays, and navigable streams generally, as well as the tide-waters, were jealously guarded from private appropriation, and reserved for common use." *Id.* at 395. Then, the Court went on to discuss the enactment of the Navigable Stream Statute: "As early as 1837, congress . . . enacted 'that all streams, of the average width of thirty feet, shall be considered navigable streams,' and 'shall not be crossed by lines of a survey.'" *Id.* at 395–96. The Court makes an important distinction between "navigable streams" and "the shores of the sea," "bays," and "the tidewaters" and then discusses the Navigable Stream Statute in reference *only* to navigable streams—not to tidally influenced water. *See id.* The Court's distinction is significant because it suggests not only a difference between navigable streams and bodies of water subject to the ebb and flow of the tide but also that the Navigable Stream Statute did not apply to submerged land below tidal waters. And because the Small Bill was enacted in reference to the Navigable Stream Statute, it too does not apply to submerged land under tidally influenced waters.[2]

---

[2] The Court suggests that the Small Bill's use of "all" must mean that it applies to tidally influenced areas. *Ante* at __. But because the Small Bill's applicability is limited to the same scope as the Navigable Stream Statute, which itself applies only to submerged land above the line of mean high tide, the Small Bill's use of "all" does not extend the Small Bill's applicability to tidally influenced areas.

The Court in *Menard* went on to discuss the common law's treatment of ownership of submerged land:

> The well established doctrine of the common law, which is more favorable to private appropriation, than the civil law, is, that an ordinary grant of land upon a bay, whose tide ebbs and flows, does not convey the shore or any of the land of the bay covered with water.

*Id.* at 396. The Court's discussion of the civil law and the common law's treatment of land underlying tidally influenced bodies of water demonstrates the harmonization of the civil law, the Navigable Stream Statute, and the common law. Under both the civil law and the common law, the State owned title to submerged land under tidally influenced water. But only under the civil law did the State own title to the beds of navigable streams, because the common law was "more favorable to private appropriation." *Id.* Consistent with the civil law's protection of the State's interest in land under navigable streams above the line of mean high tide, the Navigable Stream Statute prevented patents that crossed navigable streams but said nothing about submerged land below the line of mean high tide. When the common law was adopted in 1840, its rule prohibiting a grant of land that included submerged land below the line of mean high tide was adopted only below the line of mean high tide. Indeed, the Houston Court of Civil Appeals explained that the common law rule of sovereign ownership applies at the line of mean high tide: "The law is well established that in the tidewater sections of navigable streams, the sovereignty is the proprietor and owner of the land beneath the water." *Seabrook Land Co.*, 331 S.W.2d at 433–34. The adoption of the common law rule of sovereign ownership of submerged land below the line of mean high tide is in harmony with both the civil law and the Navigable Stream Statute: the common law rule treats submerged land in

9

the same way as the civil law did, and it does not conflict with the Navigable Stream Statute, which applies only to navigable streams above the line of mean high tide and not to the sea, bays, or tide-waters.

Finally, *Manry*—which the Court relies on for its contention that the Navigable Stream Statute applies to navigable streams below the line of mean high tide—was itself a case that dealt with the Brazos river, an upland, freshwater river. 56 S.W.2d at 441–42. Indeed, the Court's *Manry* opinion expressly acknowledged the different rules for land submerged under different bodies of water by including the following statement at the conclusion of the opinion: "The effect of this opinion is to be confined to abandoned stream beds above the ebb and flow of the tide. What rule should be applied to relicted lands below tidewater is not before us, and no opinion is expressed thereon." *Id.* at 449. In other words, *Manry* provides no authority for the Court's position, and to the extent that it discusses the issue, it supports the opposite conclusion—the line of mean high tide is critical to determining ownership of submerged lands; the body of law derived from the Mexican civil law applies above that line, and the adoption of the English common law can be harmonized with that body of law.

The Court contends that because the common law and the civil law treated submerged land below the line of mean high tide the same, the common law's rule has no bearing on the outcome of this case. *Ante* at __. But, as discussed above, this conclusion ignores the reality that the common law's rule of the sovereign's ownership of submerged land below the line of mean high tide was adopted as the rule in Texas in 1840, and any law enacted after 1840 must be interpreted in light of this rule. When construing statutes, this Court avoids an interpretation that renders a statute

10

meaningless. TEX. GOV'T CODE § 311.021(2); *Crosstex Energy Servs. L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014) (citation omitted) ("We must not interpret the statute 'in a manner that renders any part of the statute meaningless or superfluous.'"). Reading the Navigable Stream Statute and the Small Bill to apply to submerged land below the line of mean high tide after the adoption of the common law in 1840 would render meaningless the common law's rule that all submerged land underlying tidal waters belongs to the State. Refusing to follow the common law's rule of State ownership at the line of mean high displaces a body of law that the Legislature clearly intended to adopt insofar as it was not inconsistent with the law already in place in 1840. Further, applying the common law to submerged lands below the line of mean high tide does nothing to obviate the applicability of the Navigable Stream Statute or the Small Bill to submerged land above the line of mean high tide.

The common law's rule that submerged land below the line of mean high tide belongs to the State was in place when the Governor attempted to award the patent that included submerged land under the tidally influenced Lone Oak Bayou to Sophronia Barrow in 1872. Because the Governor's patent included land submerged under tidal water—in violation of the common law's rule prohibiting such grants—it did not convey any land submerged under the tidally influenced Lone Oak Bayou. *See Menard*, 23 Tex. at 395–96. And the Small Bill, which was enacted after the adoption of the common law and thus did not apply to submerged land below the line of mean high tide, did not save the conveyance. Accordingly, the portions of the Governor's patent to Barrow that included submerged land below the line of mean high tide were invalid, and Barrow never acquired valid title to those tracts of land.

11

**II. The Presumption of State Ownership of the Land Under Tidally Influenced Water**s

Consistent with Texas law's differing treatment of land submerged under tidal and non-tidal waters, there is a presumption in Texas that the State owns submerged land below the line of mean high tide. *See Lorino v. Crawford Packing Co.*, 175 S.W.2d 410, 413 (Tex. 1943) (citations omitted) ("There is no presumption that the State has parted with title to lands covered by navigable waters, because such lands are not subject to sale by the Commissioner of the General Land Office or other ministerial officer, but are presumed to belong to the State."). In *Lorino*, the Court explained that the State owns submerged land below the line of mean high tide, and the State may not divest its interest in this land absent a clear Legislative grant releasing the State's interest. *Id.* at 414. As a result of this presumption—which is, in itself, a recognition that the English common law was adopted up to the line of mean high tide—the Navigable Stream Statute and the Small Bill are inapplicable to land submerged under tidal waters altogether. This proscription of the non-legislatively endowed conveyance of land under tidally influenced water defeats the Club's claim to ownership of the Lone Oak Bayou.

The dispute in *Lorino* involved a trespass-to-try title suit in which Lorino attempted to assert his ownership of a strip of land that extended into the Tres Palacios Bay in Matagorda County. *Id.* at 412. Pursuant to a permit from the federal government, an oyster house was erected off the end of the strip of land where the water was roughly three-feet deep. *Id.* In addition, a wooden pier was built connecting the oyster house to the land. *Id.* Over time, shucked oysters fell into the water and built up a bank around the oyster house and pier that rose above the water, creating what was in essence dry land. *Id.* Lorino purchased the strip of land, including the oyster house and pier. *Id.*

12

Lorino then leased the property to Hafner, who subsequently sold the property to Crawford Packing Company (Crawford). *Id.* Lorino brought a trespass-to-try title action against Crawford for title to and possession of the oyster house, the pier, and the strip of land. *Id.* No titles to the land were presented to the trial court, but Lorino argued he owned the property under the priority of possession doctrine and Crawford's failure to prove that it held title to the land. *Id.* at 412–13.

In deciding who owned the land under the tidally influenced water of the Matagorda Bay, this Court discussed the presumption that submerged land under bodies of water subject to the ebb and flow of the tide belongs to the State. *Id.* at 413. Submerged lands below the line of mean high tide, we observed, "are not subject to sale by the Commissioner of the General Land Office or other ministerial officer, but are presumed to belong to the State." *Id.* In discussing the presumption of State ownership of submerged land below tidally influenced bodies of water, we defined these bodies of water as "navigable waters." *See id.* (citations omitted) ("The bays, inlets, and other waters along the Gulf Coast which are subject to the ebb and flow of the tide of the Gulf of Mexico are defined as 'navigable waters.'"). This description of tidally influenced bodies of water further suggests a distinction, for purposes of ownership, between "navigable waters"—which are tidally influenced—and "navigable streams" as described in the Navigable Stream Statute and the Small Bill, which are not tidally influenced. This Court has used the term "navigable waters" more broadly when discussing, generally, bodies of water that have long been held by the State. *See, e.g.*, *State v. Bradford*, 50 S.W.2d 1065, 1069 (Tex. 1932) ("The rule long has been established in this state that the state is the owner of the soil underlying the navigable waters, such as navigable streams, as defined by statute, lakes, bays, inlets, and other areas within tidewater limits within its

13

borders."). Even in using "navigable waters" in this context, however, we differentiated between a "navigable stream[], as defined by statute" and "other areas within tidewater limits within its borders." *Id.* In *Bradford*, we did not use "navigable waters" as a term of art like we did in *Lorino* to describe those tidally influenced bodies of water that are presumed to be owned by the State absent an express, legislatively endowed relinquishment of State ownership. *Lorino*, 175 S.W.2d at 413–14.

The Court dismisses the notion that the Small Bill was inadequate to relinquish the State's ownership of land submerged below the line of mean high tide, postulating that the Legislature's intent in passing the Small Bill was to make patentees whole—not to relinquish the State's interest in land. *Ante* at __. In support of this interpretation of the Small Bill, the Court quotes the Court's opinion in *Bradford*, in which the Court said that "the Small Bill did not undertake to give the patentees and awardees and their assignees anything belonging to the state," but instead "issued the patents and awards." 50 S.W.2d at 1077. But this statement from *Bradford* does not mean that in making patentees and awardees whole, the Legislature did so as to submerged land below the line of mean high tide. Nothing in the Court's opinion in *Bradford* suggests that the Small Bill must validate patents that include submerged land below the line of mean high tide. To the contrary, *Bradford*'s use of "navigable waters" and "navigable stream" tells a different story—the Small Bill did not grant patentees absolute title to land under navigable waters (meaning, as we have explained, tidally influenced waters). *Id.* at 1076. Reading the Small Bill in the way the Court does ignores the long-standing presumption in Texas that the State owns the submerged land below the line of

14

mean high tide, and only the Legislature may divest the State's interest in this land through express terms.

Because there "is no presumption that the State has parted with title to lands covered by navigable waters," such land cannot be relinquished or sold by an executive officer of the state, such as the Governor or the Land Commissioner. *Lorino,* 175 S.W.2d at 413. Instead, only the Legislature may release the State's title to submerged land below the line of mean high tide. *Id.* at 413–14. Indeed, we said in *Lorino* that "navigable waters and streams are reserved to the State for the use of the public generally, and no one should have an exclusive right to the enjoyment of such property, unless and until the Legislature has granted such right." *Id.* at 414. And, as discussed above, the Legislature did grant that right in the Small Bill as to land underlying navigable *streams*, but it did not grant that right as to land underlying navigable *waters* which, as described at length in *Lorino*, means those waters subject to the ebb and flow of the tide. *Id.* at 413. In order to release State ownership of land underlying navigable waters—those that are subject to the ebb and flow of the tide—the Legislature must use express and specific language. *See id.* (citations omitted) ("The rule is firmly established in this State that land under navigable waters is withdrawn from the general provisions of the statutes conferring upon the Land Commissioner the right to contract for the sale or lease thereof, and passes by grant or sale only when so expressly provided for by the sovereign authority; and there is no presumption that the State has authorized such grant or sale."). As *Bradford* recognizes, nothing in the Small Bill "expressly provided" for the release of the State's interest in tidally influenced navigable waters. Indeed, there was no mention of tidal waters in the Bill, as it was directed at upland navigable streams governed by the Navigable Stream Statute. And

15

because the State is presumed to own all submerged land below the line of mean high tide, any doubt as to ownership must be resolved in favor of the State. *Id.* at 414.

In concluding that the Small Bill's language was sufficient to relinquish the State's interest in land submerged below the line of mean high tide, the Court compares the Small Bill to the 1925 statute that relinquished the State's interest in certain submerged land, including the Houston Ship Channel. *Ante* at ___. The Court suggests that the 1925 statute's use of the words "rivers, streams, and other channels" is similar to language used in the Small Bill, and therefore if the State's relinquishment of the Houston Ship Channel was valid then the Small Bill must be a valid relinquishment of the State's interest in land submerged below the line of mean high tide. *Ante* at___. But when read in its entirety, the legislation relinquishing the State's interest in the Houston Ship Channel was demonstrably more express and specific than the Small Bill.

The 1925 legislation relinquishing the State's interest in the Houston Ship Channel reads:

> The State of Texas hereby relinquishes, quit claims and grants unto all incorporated cities and towns that have a population of forty thousand inhabitants, or more, according to the 1920 census, all of the beds and channels, and also all of the abandoned beds and channels, of all rivers, streams and other channels that are now or that may hereafter be within the present or future corporate limits of such cities or towns, in so far as the beds and channels, and such abandoned channels, of such rivers, streams and other channels may be owned or claimed as the property of said State.

TEX. REV. CIV. STAT. art. 7467a (1925). This legislation only relinquished the State's interest in submerged land within the corporate limits of cities and towns with a population of at least 40,000 inhabitants. *Id.* Based on the population of Texas in 1920, only eight Texas cities and towns had a population of 40,000 or more inhabitants: Beaumont, Dallas, El Paso, Fort Worth, Galveston,

16

Houston, San Antonio, and Wichita Falls. *See* THE TEX. ALMANAC, CITY POPULATION HISTORY FROM 1850–2000, https://texasalmanac.com/sites/default/files/images/CityPopHist%20web.pdf (last visited Apr. 24, 2020) (showing the population of Texas cities from 1850 to 2000 based on data from the United States Census Bureau). By limiting the State's relinquishment to only the submerged land within the corporate limits of these eight cities, the 1925 legislation was express and specific. The Small Bill, on the other hand, purported to relinquish the State's interest in all "lands lying across or partly across watercourses or navigable streams . . . including the beds or abandoned beds of navigable streams." TEX. REV. CIV. STAT. art. 5414a. The Houston Ship Channel statute's express and specific language makes it irrelevant to the analysis of whether the Small Bill validly relinquished the State's interest in submerged land below the line of mean high tide. As a result, the Court is mistaken to suggest that holding that the Small Bill was insufficient to relinquish the State's interest in submerged land below the line of mean high tide would call into question the validity of the 1925 relinquishment of the State's interest in the Houston Ship Channel. *Ante* at __.

In light of the presumption that the State owns submerged land below the line of mean high tide, the analysis must shift to the GLO's argument that the portion of the Governor's patent that purported to convey a section of the bed of the Lone Oak Bayou to Sophronia Barrow in 1872 was invalid from the start. As this Court discussed in *Lorino*, an executive officer may not relinquish the State's interest in submerged land below the line of mean high tide absent an express legislative grant. 175 S.W.2d at 14. Nothing in the record reflects that, at the time that the Barrow Survey was executed in 1872, the Legislature had expressly relinquished the State's interest in the land underlying the Lone Oak Bayou, which no one contests is tidally influenced. Because only the

17

Legislature could have released the State's interest through express terms in the tidally influenced Lone Oak Bayou, the Governor was not authorized to grant a patent that included a portion of the Lone Oak Bayou. The only conclusion that flows from this, therefore, is that the Governor's attempt to transfer a portion of the Lone Oak Bayou to Sophronia Barrow in 1872 failed, and as a result, the Club never took valid title to that portion of the Barrow Survey.

The GLO made this very argument in its motion for summary judgment and—albeit briefly—reiterated the same argument in its brief in this Court. In its motion for summary judgment in the trial court, the GLO argued that because the portion of Lone Oak Bayou at the center of the dispute in this case is tidally influenced, the Governor's grant of the original patent was invalid. Specifically, the GLO argued that there was no explicit legislative grant of rights to lands underlying tidally influenced waters through the Small Bill. In its brief on the merits, the GLO argued that the Governor's patent to Sophronia Barrow "was ineffective to have conveyed the submerged land beneath the tidally influenced, navigable waters of the [Lone Oak] Bayou" because it was conveyed by the Governor and not the Legislature. Indeed, only the Legislature may relinquish the State's interest in land submerged under tidally influenced bodies of water, and it must do so expressly. As the Court explained in *Severance v. Patterson*, 370 S.W.3d 705 (Tex. 2012):

> Long-standing principles of Texas property law establish . . . . that the "soil covered by the bays, inlets, and arms of the Gulf of Mexico within tidewater limits belongs to the State, and constitutes public property that is held in trust for the use and benefit of all the people." . . . These lands are part of the public trust, and only the Legislature can grant to private parties title to submerged lands that are part of the public trust.

18

*Id.* at 715–16 (citations omitted). When Sophronia Barrow acquired the Barrow Survey from the Governor, the Legislature had made no express relinquishment of title to the Lone Oak Bayou; therefore, the portion of the survey that included the bed of the Bayou was invalid, and as a result, title never passed to the Club.

The Court reasons that if the Small Bill applies above the line of mean high tide then it must likewise apply below. *Ante* at __. But this is not correct. Our case law discussing the presumption of state ownership of submerged land below the line of mean high tide indicates that the line of mean high tide is the determining factor in deciding which law governs the ownership of submerged land. *See, e.g.*, *Lorino*, 175 S.W.2d at 413 (explaining that submerged lands below the line of mean high tide "are not subject to sale or disposal by the Commissioner of the General Land Office or other ministerial officer of the State; that lands not subject to sale by said officers are presumed to belong to the State"). And even *Manry*, from almost eighty years ago, recognized that certain common law rules for ownership of submerged land need not be applied above the tide. 56 S.W.2d at 446. As a result, there is nothing to suggest that the Small Bill cannot operate to validate patents that cross navigable streams above the line of mean high tide, while at the same time be insufficient to relinquish the State's ownership of submerged land below the line of mean high tide. It is the submerged land below the line of mean high tide that require express legislative relinquishment of state ownership. Accordingly, concluding that the Small Bill does not satisfy the public trust doctrine to relinquish state ownership of submerged land below the line of mean high tide would not require the overruling of our precedent or mean that the Small Bill is inapplicable to submerged land above the line of mean high tide.

19

### III. Conclusion

Because longstanding principles in Texas law demand separate treatment of submerged land below the line of mean high tide, I would conclude that the Navigable Stream Statute and the Small Bill do not apply to submerged land below the line of mean high tide. These statutes do not address the line of mean high tide—a significant factor in determining which law governs ownership of submerged land in Texas—and there is no reason to expand these statutes' applicability to tidal waters when there is no indication of the Legislature's intent to do so, and the historical context supports an above-tide interpretation. Further, the Small Bill's language fails to meet the requirement that only the Legislature, through clear and express language, may relinquish the State's interest in submerged land below the line of mean high tide. Because there is no dispute in this case that the portion of the Lone Oak Bayou in question is subject to the ebb and flow of the tide, I would reverse the judgment of the court of appeals and render judgment for the GLO. Accordingly, I respectfully dissent.

_____
Paul W. Green
Justice

OPINION DELIVERED: April 24, 2020

20