**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00142-CV**
_____

**DAWN BUCKINGHAM, Appellant**

**V.**

**EDWIN ARNAUD, INC., Appellee**

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. 220230-C**

**MEMORANDUM OPINION**

This is a case to determine the title to submerged land claimed by both Appellee Edwin Arnaud, Inc. ("EAI" or "Plaintiff") and the State of Texas, by and through its Land Commissioner. Following a bench trial, the trial court rendered judgment for EAI. Appellant Dawn Buckingham, M.D. (the Commissioner), in her official capacity as Commissioner of the General Land Office of the State of Texas (GLO), complains the evidence is legally insufficient to support the trial court's

1

findings that (1) the submerged land became submerged solely as a result of the production of oil, gas, and saltwater; (2) the Commissioner failed to prove that EAI's claims were barred by the Texas Natural Resources Code; and (3) the Commissioner failed to prove EAI's claims were barred by limitations. The Commissioner alternatively argues that if this Court finds the evidence is sufficient to support the trial court's judgment, the judgment must be reformed to include only the submerged property that is the subject of this suit. We affirm the trial court's judgment.

**BACKGROUND**

The State of Texas is presumed to own submerged lands. When EAI contracted to place dredge spoil on submerged property within the boundaries of land it previously purchased, the GLO asserted its presumed ownership to those areas. EAI therefore filed this ultra vires trespass to try title suit against the Commissioner of the GLO, alleging that an exception to the State's presumed ownership applies. We summarize the evidence below.

Edwin Arnaud's Testimony

Edwin Arnaud, the president and CEO of EAI, testified that he was a retired firefighter. Since about 1980, however, Arnaud also worked as an oil and gas landman, putting together various deals, buying rights-of-way and leases, and the like. Arnaud recalled that he "really got into" mitigation when he sought to cut trees from a cypress swamp, and an individual from the Corps of Engineers helped him

2

"do the mitigation banking for that property." Afterward, Arnaud "did another project of about 600 acres," and then formed EAI to purchase the property that is the subject of this case.

When EAI bought the subject property, the oil wells had been plugged, and there was nothing left on the property but bridges and roads and some open water areas. Arnaud considered the property "an opportunity to do wetland mitigation . . . because there was a lot of it that needed to be restored." Arnaud believed he "could sell mitigation off that stuff right away." In describing mitigation sale, Arnaud stated:

> When you have property like that, you make a deal with somebody like Total or Entergy, Gulf States, or Port of Beaumont. They have a project going, and they have to go in and impact some wetlands. Well, they have to offset those wetlands. And, usually, they buy mitigation credits, which at that time, there really wasn't many mitigation banks.

When Arnaud's mitigation plans did not progress as he anticipated, he worked under a Total permit to place dredge spoil on a forty-acre tract and planted the area with wetland plants. After monitoring the area for five years, Arnaud considered the project "[v]ery successful." Arnaud outlined the paperwork necessary to obtain the permit for the project, recalling that the permitting process required a public notice, and notice to the GLO. The GLO did not impede that project by claiming ownership of the property or by requiring Arnaud to lease the property from the State.

3

In 2010, Arnaud performed a similar project for Jack Aquinaga, placing spoil on open water. Although the public and the GLO were again notified, the State, as before, neither claimed ownership nor required EAI to lease the submerged property.

In about 2013, Arnaud contracted with Oiltanking to place dredge spoil on the property. During the permit process of this project, the State claimed ownership of the submerged land. Arnaud therefore scheduled a meeting with Tony Williams and others from the GLO. During that meeting, the GLO personnel told Arnaud that the State owned the submerged land but offered Arnaud the opportunity to lease the land from the State. Although Arnaud believed that the property was submerged due to man-made activity, he agreed to lease the property from the State because the contract with Oiltanking promised to be lucrative. The State also required Arnaud to perform a Coastal Boundary Survey, and Arnaud retained Nedra Townsend to conduct that survey. The purpose of the survey was to identify the boundary of mean high water. The Oiltanking project restored the marsh, improving duck hunting by turning open water into marsh with vegetation. In Arnaud's estimation, "2- or 3,000 teal sleep there every night when it's duck season."

When asked about causes of submergence other than mineral production, such as erosion due to weather or boat traffic, Arnaud testified that he noticed neither a significant difference in the width of the canals on the property nor loss of any land to the open waters. Arnaud did, however, recall that Hurricane Harvey "cleaned out

4

the marshes . . . floated off all the [] Salvinia and some other stuff that was floating turf." Arnaud further testified that wake from boats did not affect open water but instead dissipated against the banks and that he had not noticed the area of open water expanding due to erosion. He also acknowledged that erosion had occurred due to boat traffic on the canals.

Arnaud acknowledged that the water level on the property fluctuated because of the ship channel and other bodies of water. In addition, Arnaud agreed that the subject property was submerged when he bought the property, and that he knew of the State's ownership claim before purchasing the subject property.

Dr. John Sharp's Testimony

Sharp, a University of Texas professor emeritus of earth and planetary sciences, testified that in addition to his academic credentials, he is a registered geologist and a certified hydrogeologist. With specific reference to subsidence, Sharp noted that his Ph.D. "was modeling the Gulf of Mexico based on fluid pressures, temperatures, and processing distribution. . . . [W]e found that there was significant subsidence over some of the oil fields." Based on his review of the Townsend and Shine reports, Sharp believed that there was an average of six and one-half feet of subsidence over the six wells in the oil field. Sharp compared the Rose City Oil Field to others and stated that its rate of subsidence was "very similar to others in the area." In his words, "[t]hese fields are sinking fast."

5

Sharp defined subsidence as "sinking of the land relative to a fixed arbitrary elevation." According to Sharp, who referred to the 1994 U.S. Geological Survey map, the natural subsidence of the Rose City Oil Field was at most a half an inch between 1950 and 1994. Had there been no pumping of oil and gas, "you wouldn't even see its effects today." Sharp also noted the effect of relative sea level rise, which averaged about one millimeter per year over the previous century but had increased to over three millimeters per year by the time of his testimony. When considering only natural subsidence and sea level rise, Sharp would have expected the land to be two inches lower, rather than the six and one-half feet measured. Based on his education, expertise, and analysis of the data, Sharp believed that the "production of hydrocarbons from the Rose City Field was a substantial factor in causing submergence which was caused by subsidence; and without this, that land would not have submerged." Sharp also considered other plausible causes of submergence, including erosion, relative sea level rise,[1] and tectonic plate movement, but excluded these plausible causes as substantial or significant to the property's submergence.

As for erosion due to boat traffic, Sharp noted that he did not see that bayous or canals had "migrated significantly in any of the aerial photographs or topographic maps" he had seen. Based on that observation, Sharp did not think there was

---

[1] Sea level rise along the Texas coast was estimated at one-third of a centimeter per year but was increasing.

6

"significant lateral erosion on those." Moreover, Sharp noted that the aerial photographs from the 1950s and 1960s showed no open water. When asked about wind erosion, Sharp opined that "there would be no wind-driven erosion waves until the property had already submerged[,]" but acknowledged that wind erosion was not his area of expertise. Sharp did not dispute that the subject property was tidally influenced or that "many thousands of factors[]" contributed to the property's submergence.

Nedra Townsend's Testimony

Townsend, a Registered Professional Land Surveyor and Licensed State Land Surveyor, testified, describing her professional qualifications and experience. Townsend explained that the EAI property consisted of two tracts of land: one tract was granted to William Stephenson by the Republic of Mexico in 1835, and the other tract was granted to William Stephenson's brother, Gilbert Stevenson, by the Republic of Texas.[2] The surveys of these tracts reflect that they originally contained trees, prairie, and farmland, as well as swamp land. Some of those trees were in places that are now open water.

Specifically referencing her work quantifying subsidence for EAI, Townsend testified that she did "a subsidence study in which [she] looked at the benchmarks in

---

[2] Gilbert Stephenson's surname is alternately spelled "Stevenson," but both spellings refer to the same person.

the area that have been set by National Geodetic Survey and some university-type things." As Townsend explained, benchmarks are "set by the National Geodetic Survey . . . some universities, and a couple by the Orange County Engineer's Department." Benchmarks are "set for the purpose of giving accurate horizontal and sometimes vertical information[.]" Townsend used benchmarks "with vertical values to ascertain the – if there had been [a] drop in the elevation of the benchmarks." She determined that "the cumulative subsidence was eight-tenths of a foot," and that "the land ha[d] sunk substantially from when the well was put in in 1950." Townsend concluded that the land sank "in excess of five feet[,]" and that "this amount of drop was caused by the withdrawal of oil and water from that Rose City Field." Townsend also agreed with Sharp that erosion, sea level rise, and tectonic plate movement were not significant factors in the submergence observed on the subject property. When asked whether oil and gas production was the sole factor contributing to the submersion of portions of the subject property, Townsend responded "[y]es, I think it is." She then clarified, however, that subsidence was the major factor.

Townsend has "also taken measurements on the ground in the vicinity in Mr. Arnaud's property of the submerged lands in connection with this." In addition, Townsend "established boundaries of parts of the property in connection with performing the Coastal Boundary Survey." Townsend identified Plaintiff's Exhibit

8

2, which she prepared, as showing the boundary of the subject property. Townsend identified Exhibit 16 as an aerial survey taken in 1953, three years after the oil field began operating. She noted that the open water shown in the 1994 topographic map is not reflected in the 1953 survey.

Tony Williams' Testimony

Williams testified that he was the deputy director for coastal field operations for the GLO, where he provides guidance on coastal issues involving federal and state agencies. He related that the GLO manages sovereign land, including submerged land. A significant part of what the GLO does is to manage the State's land and resources to generate revenue to support public education. This revenue comes from oil and gas, as well as investment opportunities and surface leases of submerged land, which "begins at the mean high tide or mean higher high tide depending on the original survey and extends to" Three Marine League [about ten miles] offshore. Williams explained that the State works with its survey division to identify state-owned lands.

Williams testified about the impact of logging operations conducted before oil and gas production began on the property. Canals were created to facilitate the logging operation, salt water intruded and killed the freshwater plants, so the soil eroded because there were no plants to keep the soil in place. Open water consequently took the place of previous areas of soil. When Williams visited the

9

area, he observed "a lot of cypress stumps in the area[,]" and noted that the water was brackish and was tidally influenced. In 2010, the survey division set tide gauges to measure tidal change "and document that it's tidally connected to the adjacent known locations." Williams also read from a report by EAI's consultant, which states:

> It can be clearly observed that the loss of wetlands commenced south and southeast in immediate proximity to the Neches River Waterway, and has, year by year, expanded increasingly further north into the marshlands commencing in vicinity to bayous and drains within the wetlands and expanding as freshwater plant complex died and the mucky soils were lost through tidal exchange and increasing wave impact.

In addition to outlining his participation in various other projects, Williams addressed his involvement in the subject property, which is 324 acres. According to Williams, he and the GLO first became aware of this property when EAI submitted its mitigation bank proposal in 2009. That project "was going to place material in areas that are submerged and raise them up to marsh elevation and plan[t] them to create habitat." In conjunction with this proposed project, Williams and the Interagency Review Team met with Arnaud in late 2009 to discuss "the proposed Mitigation Bank, the service area and ownership of the proposed site." During the meeting, Arnaud "was told that the GLO would identify that as being State-owned submerged land[.]" A mitigation project on State-owned submerged land required a lease easement from the GLO.

EAI's 2012 Oiltanking project "was proposing to excavate a slip primarily on private land but there was a portion of State-owned land that would be excavated for the project." It was called a "permittee responsible mitigation." The Oiltanking mitigation plan described the subject property as "open tidal water that has resulted by subsidence and saltwater intrusion. The historical marshes that previously existed in this area were predominantly situated above mean high tide line but were subject to periodic high tides and flood events."

The GLO and Arnaud worked to "identify the project and set up special conditions that address the success criteria for the habitat." They also "set up the payment schedule for the lease." The parties executed the twenty-year lease in 2014. The lease required an initial payment, annual payments thereafter, and payments for cubic yardage of material placed on site.

Jens Figlus' Testimony

Figlus testified that he was a coastal engineer and an associate professor in the Ocean Engineering Department at Texas A&M University. He studies the coastal areas to understand how they are affected by storms. Since Figlus has obtained research grants from the GLO, he has "crossed paths" with Williams many times.

In this case, Figlus "was asked to investigate whether any erosive processes or erosion or other processes that are not related to subsidence of the land or sinking of the land could be the cause for those lands becoming submerged." To do so, Figlus

11

reviewed documents from both the GLO and public sources, including tide gauges and public records, and viewed the subject property. In considering this data, Figlus learned that sea levels along the Texas coast have risen at the rate of six millimeters per year since the mid-1950's and that the rate is accelerating. The information also indicates that land at the Galveston Pier 21 station is subsiding at over six millimeters per year. Using an assumed water depth of one foot and wind speed of ten miles per hour, Figlus determined that erosion was a factor "that is happening out there."

Figlus' overall opinion was that "there are many processes that can contribute[]" to the submergence of the subject property, including saltwater intrusion, rising sea levels, erosion, and the extraction of oil and gas.

Documentary Evidence

The exhibits include photographs, surveys, charts, maps, deeds, court documents, correspondence, and experts' reports.

The Trial Court's Findings of Fact and Conclusions of Law

Findings of Fact

1. The property ("Property"), within whose boundaries the disputed submerged property is located, is described as follows:

The surface only of 1,586.32 acres of land, more or less, out of and a part of, the William Stephenson Survey, A-23 and the Gilbert Stevenson Survey, A-167, Orange County, Texas, comprised of Tract 1, which is a 1,678.30 acres tract of land, more or less, being a portion of the land described as Tract "H2" and Tract "I" in that certain Special Warranty Deed, recorded in volume 874, page 974 of the deed records of Orange County, Texas - LESS AND

12

EXCEPT (a) a 238.118 acres tract of land, more or less, more particularly described in that certain Special Warrant[y] Deed, dated February 2, 2007, recorded as file no. 309246 of the public real estate records of Orange County, Texas and (b) a 135.058 acres tract of land, more or less, more particularly described in that certain Special Warrant Deed, dated August 2, 2007, recorded as file no. 316973 of the public real estate records of Orange County, Texas, and Tract 2, which is 281.200 acres tract of land, more or less, described in that certain Special Warranty Deed, dated February 14, 2007, recorded as file no. 309245 of the public real estate records of Orange County, Texas, which property is more particularly described in Exhibit "A" attached hereto, which Exhibit "A" is made a part of this Findings of Fact as if set forth herein *verbatim.*

2. The submerged lands and premises in controversy in this suit ("Submerged Property") are: (a) that portion of the surface only of the Property that is located in the William Stephenson Survey, A-23, and that is below the datum of mean higher high water, and (b) that portion of the surface only of the Property that is located in the Gilbert Stevenson Survey, A-167, and that is below the datum of mean high water.

3. The description of the Submerged Property contained in Finding of Fact No. 2, above, is sufficiently certain to identify the Submerged Property in dispute, so that from this description possession of the Submerged Property may be delivered.

4. The Submerged Property is comprised of portions of the Property located in the William Stephenson League, A-23, and in the Gilbert Stevenson Survey, A-167, Orange County, Texas. The William Stephenson League was surveyed by Franklin Hardin, and on January 29, 1835, it was granted by the Mexican government to William Stephenson. The Gilbert Stevenson League was surveyed by Benjamin Hart, Jr., and on December 11, 1841, it was patented by the Republic of Texas to Gilbert Stevenson (sometimes spelled as Stephenson). Mr. Hardin's calls for the Mexican grant, and Mr. Hart's calls for the Republic's patent, each show that the lands described therein contained timber and substantial lands that their surveys classified as pastureland and arable land suitable for

13

farming. At the time of each of the above-described grants, the lands described in each such grant were fast lands. (Plaintiff's Ex. 5)

5. The submerged property is tidally influenced by virtue of being hydrologically connected to the Neches River, which is a tributary of the Gulf of Mexico.

6. Plaintiff, Edwin Arnaud, Inc. ("EAI"), proved, by a preponderance of the evidence, a regular chain of conveyances emanating from the sovereign, the Mexican government, into EAI for that portion of the Property located in the William Stephenson Survey A-23, Orange County, Texas. (Plaintiff's Exs. 43-173)

7. EAI proved, by a preponderance of the evidence, a regular chain of conveyances emanating from the sovereign, the Republic of Texas, into EAI for that portion of the Property located in the Gilbert Stevenson Survey, A-167, Orange County, Texas. (Plaintiff's Exs. 174-192)

8. The Rose City Oil Field is located in the William Stephenson Survey, A-23, and in the Gilbert Stevenson Survey, A-167, Orange County, Texas. It was discovered in 1950, and it ceased producing in 2002. The Rose City Oil Field produced approximately 74.5 million barrels of oil and saltwater and 29.7 billion cubic feet of natural gas. (Plaintiff's Exs. 41 and 253)

9. EAI proved, by a preponderance of the evidence, that subsidence caused by the production of oil, gas, and saltwater, from the Rose City Oil Field ("Subsidence") was the sole cause of the submergence of the Submerged Property.

10. EAI proved, by a preponderance of the evidence, (a) that Subsidence was the only substantial factor in bringing about the submergence of the Submerged Property and (b) that without that Subsidence the submergence of the Submerged Property would not have occurred.

14

11. EAI proved, by a preponderance of the evidence, that erosion was not a substantial factor in the submergence of the Submerged Property.

12. EAI proved, by a preponderance of the evidence, that erosion was not a cause without which cause the submergence of the Submerged Property would not have occurred.

13. EAI proved, by a preponderance of the evidence, that erosion was a de minimis factor in the submergence of the Submerged Property.

14. EAI proved, by a preponderance of the evidence, that absolute (eustatic) sea level rise, was not a substantial factor in the submergence of the Submerged Property.

15. EAI proved, by a preponderance of the evidence, that absolute (eustatic) sea level rise was not a cause without which cause the submergence of the Submerged Property would not have occurred.

16. EAI proved, by a preponderance of the evidence, that absolute (eustatic) sea level rise was a de minimis factor in the submergence of the Submerged Property.

17. EAI proved, by a preponderance of the evidence, that the compaction of the substrate was not a substantial factor in the submergence of the Submerged Property.

18. EAI proved, by a preponderance of the evidence, that the compaction of the substrate was not a cause without which cause the submergence of the Submerged Property would not have occurred.

19. EAI proved, by a preponderance of the evidence, that the compaction of the substrate was a de minimis factor in the submergence of the Submerged Property.

20. EAI proved, by a preponderance of the evidence, that, even in combination, erosion, absolute (eustatic) sea level rise, and

compaction of the substrate, were not a substantial factor in the submergence of the Submerged Property.

21. EAI proved, by a preponderance of the evidence, that, even in combination, erosion, absolute (eustatic) sea level rise, and compaction of the substrate, were not concurrent causes of the submergence of the Submerged Property.

22. EAI proved, by a preponderance of the evidence, that there are no other causes, other than Subsidence, which were substantial factors in the submergence of the Submerged Property.

23. EAI proved, by a preponderance of the evidence, that there were no other causes, other than Subsidence, without which other causes the submergence of the Submerged Property would not have occurred.

24. At all times relevant to the above-captioned action, EAI, by and through its president and principal owner, Edwin Arnaud, claimed ownership of, and the right of possession of, the Submerged Property.

25. On August 26, 2014, the State of Texas, as lessor, and EAI, as lessee, entered into Texas General Land Office, Coastal Surface Lease No. SL20140004 ("Lease") covering 324.03 acres of submerged land, which 324.03 acres was but a portion of the Submerged Property. The Lease was for a term of twenty (20) years beginning on June 1, 2014; however, it was fully executed August 26, 2014. (Plaintiff's Ex. 245)

26. EAI had its surveyor, Nedra Foster Townsend, perform a Coastal Boundary Survey for Project SL20140004 (GLO), which CBS was approved by the GLO on February 5, 2015 ("CBS"). That survey was for the purpose of evidencing the location of the shoreline in the area depicted by that survey as that shoreline existed before the commencement of any erosion response activity as required by Chapter 33, TEXAS NATURAL RESOURCES CODE. That CBS also provides, inter alia, that "The line depicted on this survey fixes the shoreline for the purpose of locating a shoreline boundary, subject

16

to movement landward as provided by Section 33.136, NATURAL RESOURCES CODE." (Plaintiff's Ex. 196)

27. The Submerged Property became submerged before June 1, 2014.

28. At all times relevant to the above-captioned action, EAI, by and through its president and principal owner, Edwin Arnaud, has claimed ownership of, and the right of possession of, the Submerged Property, including during EAI's negotiations for, and execution of, the Lease and the obtaining, and filing, of the CBS with the GLO, and thereafter through the present.

29. On July 26, 2013, the GLO, in response to a public notice from the U.S. Army Corps of Engineers ("Corps") regarding Oiltanking Beaumont ("Oiltanking") permit application SWG-2000-02956, asserted that authorization from the GLO was required to use State owned submerged land, including any dredge material disposal site(s). (Plaintiff's Ex. 35)

30. As of the date of the GLO's letter to the Corps on July 26, 2013, EAI and Oiltanking had been working on entering a contract for several years for EAI to provide Oiltanking a location to place spoil materials from its dock project on the Neches River.

31. Although EAI continued to assert its ownership of the Submerged Property, including the 324.03 acres of submerged land covered by the Lease, EAI took the Lease from the State so as to protect EAI's prospective contract with Oiltanking. Otherwise, before EAI could file and litigate an *ultra vires* trespass to try title action to a final non-appealable judgment as to the title to the Submerged Property, EAI would have lost its business opportunity with Oiltanking.

32. At all times during the negotiations for the Lease, and in performing and filing the CBS with the GLO, and at all times thereafter, EAI, by and through its president and principal owner, Edwin Arnaud, continued to advise the GLO's managers and employees working on the Lease and CBS, including the GLO's Tony Williams, that EAI still claimed to own the Submerged Property, including the 324.03 acres leased from the State.

17

33. EAI has not made any false representation to, or concealed an existing fact from, Defendant, or her predecessors, the GLO, or the State, regarding the Property, the Submerged Property, or EAI's claim of ownership of the Submerged Property, the CBS, or the Lease.

34. Neither Defendant, nor the GLO, has relied to their detriment on any alleged false representation, or any alleged concealment of an existing fact, by EAI.

35. Neither the Defendant, nor her predecessors in office, acted, or failed to act, to their detriment regarding the State's claim of ownership of the Submerged Property based upon, or in reliance upon, EAI's having executed the Lease or having submitted the CBS for approval by the GLO.

36. Neither the CBS, nor the GLO's approval of that CBS, contain any words of grant, or relinquishment, of title of ownership of the approximately 324.03 acres of the Submerged Property made the subject of that CBS, or the Lease.

37. In view of EAI's candor to the GLO regarding EAI's claim of ownership of the Submerged Property, it is not unconscionable, or inequitable, to Defendant, the GLO, or the State, for EAI to assert and prosecute its claim that EAI owns the Submerged Property.

38. The Defendant did not prove, by a preponderance of the evidence, that EAI's *ultra vires* trespass to try title action is barred by any statute of limitation.

39. The Defendant did not prove, by a preponderance of the evidence, her affirmative defense of estoppel.

40. The Defendant did not prove, by a preponderance of the evidence, her affirmative defense of quasi-estoppel.

41. The Defendant did not prove, by a preponderance of the evidence, her alleged affirmative defense that TEXAS NATURAL RESOURCES CODE § 33.136 bars EAI's *ultra vires* trespass to try title action.

18

Conclusions of Law

1.  This is an *ultra vires* trespass to try title action by EAI against Defendant, in her capacity as the Commissioner of the Texas General Land Office ("GLO"), involving rival claims between the Defendant and EAI as to the ownership of the Submerged Property, which is described in Finding of Fact No. 2, above. The State is not a party to this action. Defendant, in her capacity as a government official, by and through employees of the GLO, claims that the State owns the Submerged Property.

2.  Pursuant to *State v. Lain*, 349 S.W.2d 579 (Tex. 1961), the Defendant does not have sovereign immunity from EAI's claims in this action.

3.  Due to the parties' conflicting claims of title, this controversy is ripe.

4.  This Court has subject matter jurisdiction over this action.

5.  Under Texas law, tidally influenced submerged lands are presumed to be state-owned lands. *Lorino v. Crawford Packing Co.*, 175 S.W.2d 410, 413 (Tex. 1943). That presumption, however, can be overcome if subsidence was the sole cause of the submergence of those lands. *Coastal Indus. Water Auth. v. York*, 532 S.W.2d 949 (Tex. 1976).

6.  The proper standard of causation for determining whether, or not, Subsidence was the sole cause of the submergence of the Submerged Property is the producing cause standard. Under that causation standard, a cause is a producing cause of the submergence of the Submerged Property if (a) that cause was a substantial factor in bringing about submergence and (b) without which cause the submergence would not have occurred. There can be more than one producing cause of submergence.

7.  EAI proved, by a preponderance of the evidence, that Subsidence was the only producing cause of the submergence of the Submerged Property.

19

8. EAI's *ultra vires* trespass to try title action was not barred, in whole or in part, by any statute of limitation.

9. EAI is not barred from asserting, prosecuting, or recovering on, its *ultra vires* trespass to try title action by the doctrines of equitable estoppel or estoppel at law.

10. EAI is not barred from asserting, prosecuting, or recovering on, its *ultra vires* trespass to try title action by the doctrine of quasi-estoppel.

11. EAI is not barred from asserting, prosecuting, or recovering on, its *ultra vires* trespass to try title action by TEXAS NATURAL RESOURCES CODE § 33.136.

12. By proving, by a preponderance of the evidence, that Subsidence was the sole producing cause of the submergence of the Submerged Property, EAI overcame the presumption that the Submerged Property was state-owned.

13. EAI has superior title to the Defendant in the Submerged Property.

## ANALYSIS

In a bench trial, as the sole judge of the credibility of the witnesses and the weight to give their testimony, the trial court may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). The trial court also "may disregard even uncontradicted and unimpeached testimony from disinterested witnesses." *Id.* at 820. But it is "not free to believe testimony that is conclusively negated by undisputed facts." *Id.* In our appellate review, we "credit favorable evidence if [a] reasonable [trier of fact] could, and disregard contrary evidence unless [a reasonable trier of fact] could not." *Id.* at 827. "The final test for

20

legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* "A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Tex. Outfitters, Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019) (citation omitted).

Issue One: Legally Sufficient Evidence (Subsidence and Submergence)

In her initial issue, the Commissioner contends that the evidence is legally insufficient to support the trial court's findings that (1) "subsidence was the "sole cause" of submergence of the Submerged Land[,]" and (2) "EAI's property became submerged solely as a result of the production of oil, gas, and saltwater from the Rose City Oil Field, and that factors other than subsidence did not contribute to the submergence." She bases this argument on her position that the applicable evidentiary standard is "sole cause," rather than the "but for" or producing cause standard the trial court applied.

The Texas Supreme Court has defined producing cause as "that cause which, in a natural sequence, was a substantial factor in bringing about an event, and without which the event would not have occurred." *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45-46 (Tex. 2007). The trial court used the same definition, stating that a cause is a "producing cause" if "(a) that cause was a substantial factor in bringing about

21

submergence <u>and</u> (b) without which cause the submergence would not have occurred. There can be more than one producing cause of submergence."

Evidence is legally insufficient to support a finding when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016) (citation omitted).

As the Commissioner observes, and EAI agrees, submerged land is presumed to belong to the State of Texas. *See Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 653 (Tex. 2020); *see also TH Invs., Inc. v. Kirby Inland Marine, L.P.*, 218 S.W.3d 173, 182 (Tex. App.—Houston [14th Dist.] 2007, pet denied). One may rebut that presumption by showing that the land became submerged due to subsidence caused by the production of oil, gas, and water. *See York*, 532 S.W.2d at 954; *TH Invs.*, 218 S.W.3d at 188-89. *York* explained subsidence and submergence thus:

> The precipitating cause of this subsidence is the removal of enormous amounts of underground water for purposes of industrial and municipal use. As the water is removed the sub-surface pressure is reduced, which causes layers of inelastic clay to compact. The result is the loss in surface elevation. As the land subsides, adjacent waters encroach upon and submerge the land.

*York*, 532 S.W.2d at 951.

22

First comparing the evidence to the producing cause standard, we note that Sharp testified that absent oil and gas production from the property, the surface would have subsided about two inches, as opposed to the six and one-half feet of subsidence he measured. Since the water was "maybe 8 inches deep[,]" according to Sharp, the two inches Sharp believed the surface would have subsided without mineral production would not have been enough to flood the surface. The trial court acted within its discretion as the fact-finder when it concluded that, but for the additional subsidence due to oil, gas, and groundwater production, the surface would not have subsided enough to allow saltwater encroachment over the surface of the property. The record contains evidence supporting the trial court's conclusion as to the cause of subsidence and submergence, since Sharp testified that but for the more than six feet of subsidence attributable to oil, gas, and water production, the surface of the land would not be eight inches below the surface of the water. This evidence is more than a mere scintilla, and the trial court was not required by the rules of evidence to disregard it. *See Crosstex N. Tex. Pipeline*, 505 S.W.3d at 613. The evidence also fails to establish conclusively the opposite of this vital fact. *Id.* Moreover, the trial court excluded other plausible causes, such as erosion, eustatic sea level rise, and substrate compaction, either individually or in combination, as producing causes of the submergence. This exclusion leaves mineral and groundwater production as the sole producing cause of submergence. We therefore

23

conclude that since reasonable and fair-minded people could reach the decision under review, the evidence is legally sufficient under the producing cause standard. *See City of Keller*, 168 S.W.3d at 827.

The *York* court awarded title to submerged land to W.D. York, stating "that submergence does not necessarily destroy the title of the owner." *York*, 532 S.W.2d at 954. In *TH Investments*, however, our sister court distinguished *York*, noting that unlike *York*, which involved subsidence only, the trial court found that the land involved in *TH Investments* was affected by tidal water and was subject to forces in addition to subsidence. *See TH Invs.*, 218 S.W.3d at 188-89. The Commissioner therefore relies on *TH Investments* to try to demonstrate that wind and water affected the submerged land, and that the *TH Investments* holding compels us to reverse the trial court's decision.

Applying the sole cause standard, EAI satisfied its burden of proof with Sharp's and Townsend's testimony.

Here, in contrast to *TH Investments*, the trial court found that oil, gas, and water production was the sole cause of subsidence and that subsidence was the sole cause of submergence. The trial court reasonably could have based its finding on Townsend's testimony that she believed oil and gas production was the sole factor contributing to the submersion of portions of the subject property, even though Townsend also stated that subsidence was the major factor. The trial court also could

24

have reasonably based its findings on Sharp's testimony that, absent oil, gas, and water production, the property would only have subsided approximately two inches–not more than six feet. Therefore, the property would not even be submerged. The cited testimony constitutes more than a mere scintilla of evidence to support the trial court's findings in EAI's favor. *See Crosstex N. Tex. Pipeline*, 505 S.W.3d at 613. As for the remaining factors to consider in evaluating the legal sufficiency of the evidence, the record is not completely devoid of evidence of sole cause; since Sharp and Townsend testified to sole cause, the court was not precluded from giving weight to such evidence, and the evidence does not conclusively establish the opposite of the vital fact. *See id.* Rather than address these factors, the Commissioner's argument focuses on the evidence supporting her position, which the trial court need not have credited. *See City of Keller*, 168 S.W.3d at 820. The trial court likewise was not required to credit Figlus' testimony that the subsidence and submergence were partially attributable to erosion. Since reasonable and fair-minded people could have accepted Sharp's and Townsend's testimony over Figlus' testimony, the evidence supporting the trial court is legally sufficient. *See id.* at 827.

We overrule the Commissioner's first issue.

Issue Two: Legally Sufficient Evidence (Coastal Boundary Survey)

In her second issue, the Commissioner argues that pursuant to section 33.136 of the Texas Natural Resources Code, "the filing of the Coastal Boundary Survey

establishes the State's ownership of the Leased Acres as a matter of law." *See* Tex. Nat. Res. Code Ann. § 33.136. The Commissioner's position, however, presupposes that the subject property belongs to the State since oil, gas, and groundwater production allegedly was not the sole cause of its subsidence and submergence. Since we are affirming the trial court's decision that such activities were the sole cause of subsidence and submergence, section 33.136 does not apply to the subject property. *See id.*

Section 33.136 of the Natural Resources Code states, in part:

(a) Notwithstanding any law to the contrary, a person may not undertake an action on or immediately landward of a public beach or submerged land, including state mineral lands, relating to erosion response that will cause or contribute to shoreline alteration before the person has conducted and filed a coastal boundary survey in the same manner as the survey of public land required by Chapter 21 and any applicable rule of the commissioner and has obtained any required lease or other instrument from the commissioner or board, as applicable. A person is not required to obtain a lease or other instrument from the commissioner or board if the action is confined to land owned by a navigation district or municipality. On filing of the survey, the shoreline depicted on the survey is a fixed line for the purpose of locating a shoreline boundary, subject to movement landward of that line. A coastal boundary survey conducted under this section may not be filed until the commissioner gives notice of approval under Subsection (c).

(b) The survey must contain the following statement: "NOTICE: This survey was performed in accordance with Section 33.136, Natural Resources Code, for the purpose of evidencing the location of the shoreline in the area depicted in this survey as that shoreline existed before commencement of erosion response activity, as required by Chapter 33, Natural Resources Code. The line depicted on this survey fixes the shoreline for the purpose of locating a shoreline

26

> boundary, subject to movement landward as provided by Section 33.136, Natural Resources Code."
>
> (c) Within 30 days after the date the commissioner approves a coastal boundary survey under this section, the commissioner shall provide notice of that approval by:
>
> (1) publication in the Texas Register;
> (2) publication for two consecutive weeks on the Internet website of the land office; and
> (3) filing a copy of the approval in the archives and records division of the land office.

*Id.* § 33.136(a), (b), and (c).

The section of the Natural Resources Code the Commissioner relies on and references a "public beach or submerged land[.]" *Id.* § 33.136(a). Since the adjective "public" precedes "beach" and "submerged land," it modifies both terms. *See In the Interest of H.S.*, 550 S.W.3d 151, 157 (Tex. 2018) ("The adjective precedes the uninterrupted series of nouns 'care, control, and possession' and thus modifies all three.") (citation omitted). Section 33.136(a) of the Natural Resources Code therefore refers to public beaches and public submerged land, not privately owned submerged land such as the subject property.

We overrule the Commissioner's second issue.

Issue Three: Affirmative Defense (Limitations)

The Commissioner's third issue argues that EAI's claim is barred by the applicable statute of limitations, which the Commissioner contends is three years. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.024. Section 16.024 states that "[a]

27

person must bring suit to recover real property held by another in peaceable and adverse possession under title or color of title not later than three years after the day the cause of action accrues." *Id.* Section 16.021 defines the terminology in section 16.024 as follows:

(1) "Adverse possession" means an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person.

(2) "Color of title" means a consecutive chain of transfers to the person in possession that:

(A) is not regular because of a muniment that is not properly recorded or is only in writing or because of a similar defect that does not want of intrinsic fairness or honesty; or

(B) is based on a certificate of headright, land warrant, or land scrip.

(3) "Peaceable possession" means possession of real property that is continuous and is not interrupted by an adverse suit to recover the property.

(4) "Title" means a regular chain of transfers of real property from or under the sovereignty of the soil.

*Id.* § 16.021.

Adverse possession is an affirmative defense on which the Commissioner bore the burden of proof in the trial court. *See Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990). Adverse possession is usually a fact question. *Id.* at 646. Although the Commissioner does not expressly argue that the evidence is legally or factually sufficient to support the outcome in the trial court, the essence of her argument is

28

that the evidence compelled a decision in her favor. We therefore construe the Commissioner's position on this point as an attack on the legal and factual sufficiency of the evidence.

When a party who had the burden of proof at trial brings a legal sufficiency issue complaining of an adverse finding, that party must demonstrate that the evidence establishes conclusively, i.e., as a matter of law, all vital facts in support of the finding sought by the party. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

In support of her position that EAI's claim is barred, the Commissioner states that she "has asserted State ownership by title[.]" As noted above, submerged land is presumed to belong to the State of Texas. *See Bush v. Lone Oak Club, LLC*, at 653. A party may show the requisite "regular chain of transfers" by introducing evidence establishing "title from the sovereignty of the soil down to himself; or if he shows title out of the government, and subsequent possession for sufficient length of time to toll the right of entry[.]" *Reiter v. Coastal States Gas Producing Co.*, 382 S.W.2d 243, 247 (Tex. 1964); *see* Tex. Civ. Prac. & Rem. Code Ann. § 16.021(4). The evidence does not show title in the State but instead shows that over one hundred years before EAI filed this suit, the Republics of Texas and Mexico, respectively, granted the disputed tracts of land to William Stephenson and Gilbert Stevenson, and their successive title holders eventually sold the land to EAI. According to the

29

documented title transfers, Texas has not held title to this land since it was a republic, and apparently never held title to the land granted by the Republic of Mexico. The trial court found that EAI had overcome the presumption and shown the necessary chain of title to the tracts in question. Since the Commissioner has not established all vital facts in support of her position as a matter of law, she cannot prevail. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241. We therefore overrule the Commissioner's third issue.

Issue Four: Property Description

The Commissioner's fourth and final appellate issue argues that the trial court's description of the submerged property exceeds the 324.03 acres of property subject to the lease. Since the trial court's judgment purportedly awards "EAI title and possession to property that is not reasonably in controversy in this suit," the Commissioner contends that the trial court "issued an advisory opinion on a matter not ripe for judicial adjudication, and courts in Texas lack subject matter jurisdiction to issue such opinions." The Commissioner accordingly requests us to reform the trial court's judgment "to properly define the 'Submerged Property' as being only the 324.03 [] Leased Acres and to award EAI only prospective possession of the Leased Acres[,]" since, according to the Commissioner, awarding title to the submerged property is not available relief in an ultra vires trespass to try title case.

30

We first address the Commissioner's contention that the trial court erred in its description of the subject property by granting EAI title to the entire property, as opposed to the leased property only. EAI responds that all of the submerged property was in controversy, and the trial court's judgment therefore was not an advisory opinion.

In EAI's Original Petition and its First Amended Original Petition, its live pleading at the time of trial, EAI alleges that the Commissioner was claiming title to EAI's submerged property and sought "judgment for title to, and possession of, the Submerged Property[.]" The Commissioner's predecessor in interest then pleaded "not guilty pursuant to Texas Rule of Civil Procedure 788." The trial court's judgment gave EAI title and possession to the submerged property.

Rule 788 provides, in pertinent part, "[t]he defendant in [a trespass to try title] action may file only the plea of "not guilty," which shall state in substance that he is not guilty of the injury complained of in the petition filed by the plaintiff against him[.]" Tex. R. Civ. P. 788. Rule 790 describes the effect of a defendant's "not guilty" plea, stating:

> Such plea or any other answer to the merits shall be an admission by the defendant, for the purpose of that action, that he was in possession of the premises sued for, or that he claimed title thereto at the time of commencing the action, unless he states distinctly in his answer the extent of his possession or claim, in which case it shall be an admission to such extent only.

Tex. R. Civ. P. 790.

31

Our review of Defendant's Amended Answer, its live pleading at the time of trial, reveals that both pleadings consist of a "not guilty" plea, a general denial, an alleged limitations defense, a right to supplement, and a notice of self-authenticating documents. The Amended Answer adds the affirmative defenses of estoppel and quasi-estoppel "pursuant to the coastal boundary survey performed for Plaintiff's property, which established all or part of the property at issue in this lawsuit as state-owned property, under Section 33.136, Texas Natural Resources Code." Neither pleading limits the scope of the "not guilty" plea to the leased property. Consequently, Defendant admitted that it claimed or possessed all the submerged land EAI sought to recover. *See Brumley v. McDuff*, 616 S.W.3d 826, 829, n.4 (Tex. 2021) (citation omitted). Since the trial court's judgment comports with EAI's petition and the Commissioner's answer, the trial court did not err in awarding EAI the entirety of the submerged property.

Turning to the Commissioner's contention that a trial court may not award title in an ultra vires trespass to try title suit, we note that a "trespass to try title action is the method of determining title to lands, tenements, or other real property." Tex. Prop. Code Ann. § 22.001(a). Moreover, section 22.003 of the Property Code contemplates that a final judgment in a trespass to try title action will establish title or right to possession of the property. *See id.* § 22.003; *see also Porretto v. Tex. Gen. Land Off.*, 448 S.W.3d 393, 400 (Tex. 2014). The Commissioner's reliance on *Texas*

*Parks & Wildlife Department v. Sawyer Trust* is misplaced, since *Sawyer Trust* does not hold that awarding title to submerged property is "legally unavailable in an ultra vires trespass to try title case." 354 S.W.3d 384 (Tex. 2011). *Sawyer Trust* addresses a suit against a state agency, as opposed to a state official, to determine title to land, and states that such a suit is barred by sovereign immunity. *Id.* at 390. The *Sawyer Trust* Court remanded the case to the trial court to allow the Trust the opportunity to amend its pleadings and "proceed against the governmental actors laying claim to the [property]." *Id.* at 394. When stating "[i]f the Salt Fork is not navigable, the Trust owns the bed [of the stream,]" the *Sawyer Trust* Court expressed no reservations about allowing the trial court to determine title to the submerged property if the evidence supported that outcome. *Id.*

In addition, Rule 804 states that when a plaintiff prevails

[F]or the whole or any part of the premises in controversy, the judgment shall be that the plaintiff recover of the defendant the title or possession or both, as the case may be, of such premises, describing them, and where he recovers the possession, that he have his writ of possession.

Tex. R. Civ. P. 804.

The trial court followed the cited Rule in its judgment and therefore did not err in awarding title and possession to EAI. For the reasons stated above, we overrule the Commissioner's fourth issue.

33

## CONCLUSION

Having overruled all the Commissioner's appellate issues, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on November 19, 2025
Opinion Delivered March 12, 2026

Before Golemon, C.J., Wright and Chambers, JJ.